## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **Crawford's Auto Center, Inc. and K&M Collision, LLC, on behalf of themselves and all others similarly situated,**<br><br>v.<br><br>**State Farm Mutual Automobile Insurance Company, *et al*.** | **MDL Docket No. 2557**<br><br>**Case No. 6:14-cv-6016-GAP-TBS**<br><br>**Originally filed in the Northern District of Illinois** |

## PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' FED. R. CIV. P. 12(B) MOTIONS TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Plaintiffs Crawford's Auto Center, Inc. ("Crawford's") and K&M Collision, LLC ("K&M") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, file this Consolidated Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Second Amended Complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b) and Fed. R. Civ. P. 9(b), respectively, the Joint Motion to Dismiss of Certain Defendants (Allstate, Progressive, Farmers, Liberty Mutual and Nationwide) (Doc. 209), State Farm's Motion to Dismiss (Doc. 211) and GEICO's Motion to Dismiss (Doc. 210).[1]  Unless specifically noted, Plaintiffs' Memorandum of Law addresses and responds to Defendant Insurers' common, overlapping arguments in support of their Motions to Dismiss.[2]

## I.    SUMMARY OF THE ACTION

This proposed nationwide class action is brought under RICO and other state laws to remedy Defendant Insurers' long-running unlawful conduct to suppress compensation due to

---

[1] Attached hereto as Exhibit "A" is a redline showing the modifications in the SAC.
[2] As did Defendants, Plaintiffs hereby incorporate by reference the briefing of Defendants' motions to dismiss the First Amended Complaint.  *See*, e.g., Joint Motion at 2 n.2; GEICO motion at 13 n.5.

repair facilities for automotive collision repairs performed for first and third party insurance claimants by misrepresenting what is necessary to restore the damages vehicles to "pre-loss condition", which is the standard that defines Defendant Insurers' loss payment obligations for repairs.  Defendant Insurers rely on artificial rates and repair standards to mispresent to insurance claimants and repair professionals alike what is necessary to restore vehicles to pre-loss condition, and, thereby, the appropriate measure of compensation for the restorative repairs.

Insured repairs involve a tripartite relationship.  The insurance claimants are the customers of the Plaintiffs and proposed classes of collision repair facilities, which must assume responsibility for the standard of repairs.  Defendant Insurers, in turn, are obligated to first and third party insurance claimants under insurance policies to pay for the required repairs to restore the vehicles to pre-loss condition.  Defendant Insurers indemnify and pay for losses, but these claimants are *Plaintiffs' customers*.  Indeed, repair contracts are executed by repair facilities and their customers. (SAC ¶¶ 35, 66, 289, 303) The Defendant Insurers are *not* Plaintiff's customers.  State Farm clearly explains this distinction in its "Claims Estimatics Manual":

> State Farm will pay claims based on reasonable, competitive prices for repairs necessary to repair the vehicle in a quality manner.  The policy contract and law of damages will assist us in determining whether certain operations are payable…. We do not enter into contracts with repairers on individual repair jobs on a fixed or "contract" repair job basis.  We pay for the estimated cost of repair based on the physical damage caused as a result of the loss.

*See* Exhibit "C" at 321.[3]

---

[3] As alleged in the SAC (¶ 250), State Farm's conduct in this case is guided, in part, by its Claim Estimatics Manual. Exhibit C hereto contains pertinent excerpts of the Claims Estimatics Manual, which are central to Plaintiffs' claims, incorporated by referenced, and its contents and authenticity undisputed.  Plaintiffs attach exhibits to this Brief, all of which are referenced in, and central to, the allegations in, the SAC, the authenticity of which cannot be disputed. Thus, the Court may consider them without converting Defendants' motions to dismiss into summary judgment motions, as the referenced exhibits were either attached to the SAC or are central documents referred to in the SAC. *See* Fed. R. Civ. P. 10(c) (documents attached as exhibits to the complaint are parts of the complaint "for all purposes"); *Henry v. Federal-Columbus, Inc.,* No. 8:09-cv-1809, 2009 WL 3916323, at *1 (M.D. Fla. Oct. 7, 2009) (citing Rule 10(c) and denying motion to dismiss upon consideration of well-pleaded factual allegations of plaintiff's complaint "and its attachments, which the Court is compelled to assume as true at this juncture of the

It is also important to understand that repair transactions are a fluid, evolving process.  As evidenced by the 90 sample transactions and additional evidence provided by Plaintiffs in the SAC (*see, e.g.,* SAC Exh K and Exh M, ¶¶ 282-307, SAC Exhs L - P), insured repairs generally occur over the course of days or weeks, and typically require more than one – if not several – estimates/supplements to account for the extent of the damage to vehicles and required scope of repairs.  Generally, it is not until the repair process begins to take shape that the full measure of repairs and the processes required are understood, which occurs during the repair process – and sometimes not until completion.  It is inaccurate, then, to characterize the repair transaction as a static offer and acceptance where both the repair professional and the insurer are aware of the required repairs and the cost with precision from inception; thus, there is not a firm "price" or representation of what will be paid at inception.  Rather, it is throughout the process that Defendant Insurers misrepresent what the prevailing and necessary repairs are to restore the vehicle to pre-loss condition, which, in turn, is what determines the compensation that is paid.

Defendant Insurers misrepresent: (i) the labor rates and the type of labor that is required to perform many repair procedures – which must also account for (but do not) whether the facilities being paid those labor rates have the equipment, skill and/or certification to perform

---

proceedings"); *Prof. LED Lighting, Ltd. v. AAdyn Tech., LLC,* 88 F.Supp. 3d 1356, 1368 (S.D. Fla. 2015) ("A court considering a Rule 12(b) motion is generally limited to the facts contained in the complaint and attached exhibits, *including documents referred to in the complaint that are central to the claim*") (emphasis added) (citing *Wilchombe v. TeeVee Toons, Inc.,* 555 F.3d 949, 959 (11th Cir. 2009); *Maxcess, Inc. v. Lucent Technologies, Inc.,* 433 F.3d 1337, 1340 (11th Cir.2005)). Moreover, the reference of documents by incorporation doctrine also allows a court to consider documents not attached to the complaint, because " 'a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, [the court] may consider such a document' if that document is central to the plaintiff's claims." *Daewoo Motor America v. General Motors Corp.,* 459 F.3d 1249, 1266 n. 11 (11th Cir.2006) (quoting *Day,* 400 F.3d at 1276); *see also Financial Sec. Assurance, Inc. v. Stephens, Inc.,* 500 F.3d 1276, 1284–85 (11th Cir.2007) (holding that documents referenced by plaintiff in complaint that are central to claim may be considered if contents not in dispute and defendant attaches document to motion to dismiss); *Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir.1999) (holding that "a document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute") (citation omitted); *Horsley v. Feldt,* 304 F.3d 1125, 1134 (11th Cir.2002) (referring to the incorporation by reference doctrine).

comparable repairs; (ii) the reimbursement for paint and materials used in repairs; (iii) the repair procedures that are necessary to restore the vehicle to pre-loss condition; and (iv) the time that it takes to perform the repairs.  Further, Defendant Insurers mispresent that the Plaintiffs' repair processes or the time to perform those procedures are not prevailing or competitive in the market or necessary to restore the vehicles to pre-loss condition, and/or that other collision repair facilities simply *do not charge for those repair processes*.  All of the foregoing categories comprise the so-called prevailing rates for collision repairs that Defendant Insurers seek to impose.  As discussed below, the prevailing rates are determined in a "black box", and there is no way for Plaintiffs to obtain that information – or, more importantly, to assess or verify the accuracy of the representations of prevailing rates by the Defendant Insurers.  Nor is there statistical validity to the prevailing rates, which are developed, at best, based on what Defendant Insurers pay for one-third of insured repairs (SAC ¶ 44), which is not close to a majority of the market, and cannot constitute "prevailing" data.[4]  Defendant Insurers' misrepresentations rely upon, and are made in tandem with, the Information Provider with which they partner to promulgate the so-called prevailing rates and industry repair standards.  In addition, each of the Defendant Insurers and the data company partner(s) collaborate to establish the parameters of the repairs that will be compensated, and then systematically enforce those parameters upon Plaintiffs and the proposed classes of collision repair facilities by programmatically "scrubbing" Plaintiffs' repair orders, the same repair professionals who must purchase and rely on the estimating systems to perform repairs.[5]

---

[4] In fact, there is a total lack of information or transparency about how Defendant Insurers actually compensate their DRP facilities.  It may be that Defendant Insurers are paying DRP facilities for certain repairs that for which they do not pay Plaintiffs.

[5] Attached hereto as Exhibit D are Plaintiffs license agreements with CCC, AudaExplore and Mitchell.  *See* n.3

Defendant Insurers are able to make these representations based on the so-called industry repair data and standards, which purport to set the benchmark for what are compensable repair procedures, and because the repair estimates that they present back to the Plaintiffs and the proposed classes come from the same Information Provider estimating systems used by the plaintiffs and proposed classes and have the imprimatur of the Information Providers.[6] Accordingly, it is inaccurate that Plaintiffs "possessed information sufficient to call the representation [of prevailing rates] into question". *See* Court Order dated Nov. 25, 2015 ("Order") at 15; GEICO Brf. at 18. Likewise, it is inaccurate that there could be no material misrepresentation because the so-called prevailing rates merely "represented what Defendant Insurers were willing to pay." Order at 16; GEICO Brf. At 18. Not only is that cynical, but it also does not account for the manner in which repair transactions are conducted – nor the various categories of repair compensation. Further, it endorses the notion that, so long as a fraud is "disclosed", the injured party cannot seek remedy. The misrepresentation lies not in the communication of the specific dollar amount that Plaintiffs will be paid; rather, it lies in how compensation is determined, which is based upon a misrepresentation of what is necessary to restore the vehicles to pre-loss condition and the prevailing rates for preforming those repairs.

The Eleventh Circuit addressed similar conduct in *Klay v. Humana, Inc.,* 382 F.3d 1241, 1258 (11th Cir.2004), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.,* 553 U.S. 639 (2008). *Klay* involved physicians who alleged that HMOs systematically denied, delayed, and diminished payments due to the physicians provided to subscribers, and failed to tell them about the underpayment. *Id* at 1246–47. Physicians under "fee-for-service" arrangements alleged that the HMOs set up their

---

[6] *See* Exhibits E1 – E7, *infra.*

computer systems to wrongfully deny reimbursement for certain procedures, interpret other codes as requesting reimbursement for less expensive procedures, group certain codes together, ignore modifiers that would increase the amount reimbursed, and delay reimbursement claims unnecessarily. *Id.* at 1248. The physicians also alleged that the HMOs sent explanation of benefits forms that misrepresented or concealed how the claims were actually processed. *Id.*  In sum, plaintiffs alleged that defendant HMOs systemically underpaid doctors by uniformly misrepresenting to them that the HMOs were "honestly pay[ing] physicians the amounts to which they were entitled."  *Id*. at 1258.  The Eleventh Circuit found that it did "not strain credulity to conclude that each plaintiff … relied upon the defendants' representations and assumed they would be paid the amounts they were due." *Id.* at 1259.

In sum, Defendant Insurers are failing to fulfill their loss obligations to insurance claimants under insurance policies by under-compensating repair professionals for restoring the vehicles to pre-loss condition.  But, the repairs have been performed, and the insurance claimants have received the benefit of Plaintiffs' services.  Likewise, the benefits of the Plaintiffs' services have inured to Defendant Insurers, in that their contractual loss obligations to insurance claimants have been satisfied.  It is the repair professionals like Plaintiffs which have been subjected to injury by not receiving the full measure of compensation – and cost reimbursement – for the repairs that they have performed.  Accordingly, Plaintiffs and the proposed classes of collision repair facilities are best situated to remedy the Defendant Insurers' conduct given that they have suffered the loss.

### The Market for Collision Repairs

Defendant Insurers State Farm, Allstate, GEICO, Progressive, Farmers, Liberty Mutual and Nationwide are seven of the eight largest private passenger auto insurers in the U.S.,

collectively holding approximately two-thirds of the market, and have improperly achieved substantial control in dictating how collision repairs are performed and, in turn, how repair facilities are compensated.  Collision repairs for first and third party insurance claims account for approximately $25-$30 billion annually, and these insured repairs account for between 75% and 90% of all collision repairs in the U.S.  (SAC ¶ 31)  Defendants Insurers control approximately two-thirds of all insured repairs.  (SAC ¶ 32)  There is no alternative market in which collision repair facilities like Plaintiffs can operate.  Plaintiffs must perform insured repairs to remain in business.  (SAC ¶ 88)

### Loss Indemnification

Defendant Insurers are obligated to indemnify collision losses under their policies and, in the event that the vehicles can be repaired, the vehicles must be restored to what is known as pre-loss condition.  Defendant Insurers have the option to repair the damaged vehicles or pay for the repairs.  Repairing the vehicles would saddle Defendant Insurers with liability, thus, generally, Defendant Insurers pay for the repairs performed by collision repair facilities – the professionals that are required to assume responsibility for the repairs. Defendant Insurers and repair professionals have divergent goals.  Defendants Insurers seek to limit their loss payments and have created an artificial measure to suppress compensation for repairs.  Collision repair professionals like Plaintiffs and the proposed classes in this case have a different goal, which is to complete the repairs in a safe and sufficient manner that conforms to industry standards, adheres to manufacturer guidelines and specifications, and restore the vehicles to pre-loss condition – which, of course, is what Defendant Insurers are obligated to pay for.  Repair professionals like Plaintiffs are entitled to compensation commensurate with the repairs that they are performing to restore the vehicles to pre-loss condition.

Defendant Insurers' policies require that they indemnify insureds and vehicle owners (under first and third party claims) for collision losses.  Pursuant to the policies, Defendant Insurers may elect to repair the vehicle or to pay for repairs to restore the vehicle to its "pre-loss condition".[7]  Attached hereto as Exhibit "B" are copies of excerpts of Defendant Insurers' policy exemplars in Pennsylvania and North Carolina.  Defendant Insurers utilize language to limit liability for loss payments for repairs to the so-called "prevailing competitive price" or paying for repairs of "like kind and quality", which has commonly become known as the "prevailing rates". (SAC ¶¶ 34, 66)[8]

### Defendant Insurers' DRP Programs

All of the Defendant Insurers have firmly established networks of DRP repair facilities, which agree to abide by Defendant Insurers' protocol and guidelines in performing repairs and to take less in compensation for their work.  In exchange, the DRP facilities receive a steady volume of repairs referred by the Defendant Insurers.  Defendant Insurers are thereby able to control and minimize their costs.  However, the DRP model is predicated upon speed and volume, which leads to lower quality repairs, which do not restore vehicles to pre-loss condition, and often create unsafe, dangerous vehicles.  There is a natural tension with Defendant Insurers' obligation to pay for repairs to restore the vehicles to pre-loss condition, and for the DRP facilities to perform safe and sufficient repairs.  In fact, as outlined in the SAC, each of the Defendant Insurers' DRP programs has led to frequently-required attempts to re-repair vehicles that were not correctly repaired initially, as well as buybacks that have been rendered total losses – or simply safety hazards – as the result of failed DRP repairs.  (SAC ¶¶45-46)[9]  This

---

[7] State Farm's policy provides solely for payment for repairs to restore the vehicle to pre-loss condition.
[8] These policies were referenced in the SAC and may be considered here. *See* n.3.
[9] Indeed, in one illustrative example, State Farm was forced to buyback a failed repair from the insureds, but Honda interceded to purchase the vehicle so that State Farm did not place the vehicle back into the stream of commerce –

consistently occurs with multi-shop or multi-store operators ("MSO's") – the growing trend in

DRP facilities – which are national or regional chains encompassing hundreds of facilities singly

owned and imposing uniform, company-wide protocol upon all facilities. *Id.*

Recent figures indicate that Defendant Insurers' utilization of DRP facilities ranges

between 25%-35% on the low end, and between 40% and 45% on the high end. Thus, Defendant

Insurers' utilization of DRP facilities is approximately one-third of the total of the repairs paid

for by Defendants Insurers. (SAC ¶ 44)[10] Defendant Insurers use their respective DRPs to help

establish what they contend are the prevailing rates for repairs to define the limits of their loss

obligations to insurance claimants and to likewise limit the compensation paid to repair

professionals like Plaintiffs for their repair work.

**Collision Repair Compensation**

Compensation for collision repairs is not determined solely by labor rates. Rather,

compensation is determined by applying a repair facility's hourly labor rates for repairs and

refinishing work to the actual scope and variety of the work performed, as well as the time that it

takes to perform the required labor and procedures. In addition, compensation also includes

payment to the repair facility for the costs of the paint, materials and parts used in the repairs.

(SAC ¶¶ 95-148). Thus, to dispel any confusion – or obfuscation – that has been perpetuated in

this case, the prevailing rates that Defendant Insurers seek to impose upon Plaintiffs and all

---

and onto the roadways – by selling the vehicle at auction. (In practice, State Farm paid the vehicle owners for the totaled vehicle, but then allowed the vehicle to be "retained" by the owners (and thus Honda) by netting out the salvage value of the vehicle. Notably, notwithstanding the significant structural damage to the frame rails and apron, it appeared that State Farm was initially going to re-sell the vehicle with "clean title" (rather than with "salvage title"), meaning that condition of the vehicle would be misrepresented to prospective purchasers at resale. (SAC ¶¶ 52-53)

[10] In the interest of clarity, there was an omitted word in Plaintiffs' SAC ¶ 44, which should have read: "the DRP rates are utilized by Defendant Insurers to establish the artificial prevailing rate, which is then imposed upon the entire collision repair industry, even though the rates conservatively represent – at most – one-third of **[their]** insured repair rates nationwide.

collision repair facilities nationwide are not limited solely to labor rates, but, instead, also include all repair processes and the time involved.  Even if there was validity (and there is *not*) to the so-called prevailing or competitive labor rates in the market in which a collision repair facility operates (or prevailing rates to pay for paint and materials, for which the Defendant Insurers impose an inaccurate "dollar per paint hour" rate (SAC ¶¶ 103-112), *there are no such prevailing or competitive "rates" for the scope of the required labor procedures and the time to perform those procedures*.  Each repair – based on the damage to the vehicle and the procedures required to restore the vehicle to pre-loss condition – is unique.  (SAC ¶¶ 113-139)  Repairs cannot be commoditized.  Nor can uniform, arbitrary limits be placed on the required repair procedures, the time to perform those procedures, or the materials used in the repairs.  (SAC ¶¶ 85-88, 101-102, 113-139)  Defendants Insurers' representations that there are prevailing or competitive rates regarding procedures and time (and materials) is simply inaccurate.

### Information Providers and Their Insurer Partnerships

All collision repairs use the estimating programs from one of the three co-conspirator Information Providers (CCC, Mitchell and AudaExplore).  The estimating programs appraise the damage to the vehicle and construct a blueprint for repair.  The three IPs hold 99% of the U.S. market, and sell their estimating programs to both Defendant Insurers and collision repair facilities alike.  (SAC ¶¶ 67, 71)  As noted by the FTC in its action to block the proposed merger of CCC and Mitchell, the Information Providers have deep retention rates with their insurer partners (CCC alone at 95%) and there is virtually no movement in this mature market, with market shares remaining consistent. (SAC ¶¶ 71-73) The majority of Information Provider revenue that comes from their estimating systems derives from insurers.  Defendant Insurers purchase the estimating systems from the respective Information Providers with which they

partner, and their DRP facilities are mandated to do so as well. (SAC ¶¶ 69-75) Further, as established by the FTC, insurers, which includes the Defendant Insurers, wield substantial leverage and economic influence with the Information Providers. (SAC ¶¶ 75, 80)

Together, each Defendant Insurer – in collaboration with their respective IP partner(s) – establishes: (i) industry data on collision repair rates; and (ii) industry standards for repair procedures and processes, and the time to perform the repairs, which each Defendant Insurer promulgates as the prevailing rates. (SAC ¶¶ 69-75, 113-139) However, all of this data is cleansed and diluted, and it reflects only repair data concerning Defendant Insurer's DRP facility repairs, and repair data that Defendant Insurers manipulate by under-reporting or misreporting. In any event, it is not representative of collision repair data nationally, because it does not appropriately incorporate repair data from non-DRP facility repairs. (SAC ¶¶ 89-94, 138)

Each of the Defendant Insurers has significant influence over the three Information Providers' and their estimating systems. (SAC ¶¶ 76-80, 84, 113-139, 166-168) As an initial matter, Information Provider Guides explain that the labor time entries in the estimating systems are the result of careful study, analysis, testing and data review. It is clear that these purported labor time studies are based primarily on "assumptive" knowledge that simply cannot be widely or accurately extrapolated, with very limited actual study and testing. And, the testing is often outdated – and/or does not comport with manufacturer repair specifications. In fact, the Information Provider estimating systems do *not* account for auto or paint manufacturer specifications or guidelines and (save for a limited exception in Mitchell's database) are prepared without the guidance or input of the auto and paint manufacturers. (SAC ¶ 136)

Further, the Information Providers: (i) re-do time studies until they are "able" to report results that are satisfactory to Defendant Insurers (i.e., results which reduce the labor times

designated for repair procedures); (ii) bundle numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iii) impose formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (iv) collapse and combine procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and (v) consistently designate typical or necessary repair procedures as "Not Included", all of which requires repairers to manually enter procedures, modify repair times and the like their professional judgment and discretion.  (SAC ¶¶ 77, 137, 140)

Defendant Insurers regularly meet, study and consult with the Information Providers regarding the repair processes in the estimating systems.  Further each of the Defendant Insurers has input into the estimating systems.  (SAC ¶¶166-168)  As noted by the court in the FTC case blocking the proposed merger between CCC and Mitchell, Insurer "customization" and influence is substantial[11]  (SAC ¶¶76, 80)

Defendants Insurers' influence is exemplified in the relationship between State Farm and Mitchell, its Information Provider partner.  State Farm and Mitchell began collaborating on Mitchell's estimating system as early as 1997.  Their license agreement provided, in pertinent part:

> Mitchell agrees to use reasonable efforts to correct any material errors in data as identified by State Farm and verified through applicable manufacturer (part prices) or verified through previously reported "labor rates" and/or "labor times" (as such terms are generally used in the Collision Repair Industry) and provide a replacement disc to State Farm within sixty (60) days of Mitchell's verification of the reported erroneous data.  In the event that Mitchell does not provide a replacement disc to State Farm which correct the erroneous data within the

---

[11] For example, "Labor times shown in reference to labor procedures contained in Allstate's Tech-Cor Bulletins are researched and developed by MOTOR [i.e., CCC]."  *See* CCC Guide, SAC Exhibit G at 3.

required time period, Mitchell agrees to pay state Farm within thirty (30) days of Mitchell's receipt of a notice of payment due from State Farm, the following amounts:

| | |
|---|---|
| Over 60 but under 90 days to data fix error | $10,000 |
| 90 and over but under 120 days to data fix error | $30,000 |
| 120 and over to data fix error | $50,000 |

*See* SAC ¶ 81; SAC Exh F (Bates Number ending in 1417)

State Farm had the *same* provision and agreement in effect with AudaExplore and CCC. (SAC ¶ 82; SAC Exh F at page ending in 0147)).  The depth and breadth of State Farm's influence over Mitchell's estimating system is vast, as they had control over when it could be released, influence over repair processes, labor times and material reimbursement formulas. (SAC ¶ 83; SAC Exh F, *passim*).

State Farm has similar penalty provisions regarding the data – or the ability to have changes made in labor times, operations and data – in effect to this day with all three estimatics vendors.  By way of example, when repair facilities on State Farm's DRP program are using a State Farm estimating database program – as they must – changes instructed by State Farm appear, advising that time entries or labor operations are being corrected by the Information provider.  Upon information and belief, all of the Defendant Insurers provide notification to their DRP facilities through memoranda or similar system prompts, which advise of changes being made pursuant to request.  (SAC ¶ 84)

Notwithstanding their position as industry-neutral and the purported independent guideposts of collision estimating, the Information Providers collaborate with their Defendant Insurer partner to establish strict estimating parameters that apply to the Information Provider estimating system, then programmatically scrub repair estimates for the Defendant Insurer, furthering the fraud in misrepresenting and/or concealing fair compensation for collision repairs

by Plaintiffs and the proposed classes of repair facilities, predicated on the misrepresentation of necessary repair procedures and the time and scope to perform those procedures.  (SAC ¶¶ 142 – 147)  In short, the Information Providers sell their estimating systems to both repair facilities and Defendant Insurers, then together with Defendant Insurers, defraud those same repair facilities like Plaintiffs and the proposed classes.[12]

The conduct is encapsulated by Plaintiff K&M's recent dealings with Liberty Mutual. After delineating the necessary repairs that were not recognized by Liberty Mutual, including providing support from the AudaExplore Guide and manufacturer specifications for the procedures (*see* SAC Exh O), Liberty Mutual explained the basis for the significant shortfall in repair compensation:

> The *major difference is the labor allowances from my system to K&M's*.  Audatex is the system that is chosen to be used as a basis for our appraisals and *I can't alter the preset times or labor operations allowed in it for a procedure*.  K&M has provided other documents from various other resources indicating that our system is incorrect, however, *I must follow [the system] and not change any preset times to do the procedures*.  Audatex also takes overlap into consideration as they are added to a repair appraisal.

(SAC ¶ 299; SAC Exh P) (Emphasis added)

Prevailing Rates are a Misrepresentation

First, the so-called prevailing rates have been established through Defendant Insurers' DRP agreements and Defendant Insurers' manipulated repair data that is then promulgated – with the IPs – as the industry prevailing rate but, in truth, represent only an incomplete subset of the repair data.  (SAC ¶¶ 44, 85-94)  *Only approximately one-third* of Defendant Insurers' repairs are conducted through DRP facilities.  (SAC ¶ 44)  The prevailing rate is not based on accepted

---

[12] According to Mitchell executive Greg Horn, CCC and AudaExplore published two separate versions of the estimating programs – one for insurers and one for collision repair facilities, though Horn is unsure whether there are still two separate versions.  According to Horn, Mitchell has always maintained one program.  (SAC ¶ 79)

professional industry standards; nor is it based on any statistically valid data. (SAC ¶¶ 85-94) And, again, these so-called prevailing rates are developed in a black box. Plaintiffs and the proposed classes of collision repair facilities see no data concerning the prevailing rates, let alone which would substantiate the prevailing rates. Nor is there any way for Plaintiffs to verify the accuracy of the represented prevailing rates. Though Defendant Insurers would like to impose their direct repair program rates on all collision facilities, that is not what the insurance policies provide and that is not what collision repair facilities that are not on Defendant Insurers' respective programs charge for their repairs; nor have they agreed to those repair charges. (SAC ¶¶ 35, 38-42)

Second, both labor rates measures and repair processes are frequently misrepresented, and have a flawed foundation. By way of example, in California, one of only a handful of states that has any oversight over labor rates and survey practices (*see, e.g.*, 10 CCR § 2698.91; Cal. Ins. Code § 758(c), the Department of Insurance ("DOI") has cited the consistent inaccuracy and misrepresentations in those purported labor rate survey results – by *all insurers*, and has proposed a new set of comprehensive regulations (*see* REG-2012-00002, proposing the adoption of section 2695.81), promulgating standards for uniformity and accuracy in such labor rate surveys to address, among other things: (i) "inconsistent, unreliable, and inaccurate surveys … used by insurers to settle insurance claims."; (ii) "unfair or inequitable settlement of repair claims based on unreliable or outdated auto body labor rate surveys."; and (iii) "unclear or inconsistent interpretation of the Ins. Code. Section 758(c)." *See* Initial Statement of Reasons for Auto Body Repair Labor Rate Surveys, REG-2012-00002 at 3. As described, in part, by the California DOI in its Initial Statement of Reasons:

> Currently, the various insurers determine a geographic area in several ways,
> including but not limited to United States Postal Service (USPS) Zip Code areas,

city, counties, multiple counties, and some *highly irregular and customized 'markets' or 'zones' which the insurer creates*," the DOI wrote. "The Department's experience is that some of the geographic areas used by insurers in surveys result in *artificially inaccurate, unreliable, and unreasonably low labor rates* that are not representative of the market. For example, in one instance, *an insurer used its insurance adjusters' territories as the geographic areas for its labor rate survey*, which may have been convenient for the insurer, *but which also had no relationship to the actual market areas where shops were located*. The result is a significant range in labor rates used by insurers for the same insured, claimant, or repair shop.

*Id*. at 15-16. (Emphasis added.) The Proposed Regulation Initial Statement of Reasons are available: http://www20.insurance.ca.gov/cyberdocs/Libraries/DOCS_WEB/Users/guest/regho mepage.asp?qsearchID=923429&actionMode=runFromList&__FrmID=REG&FileNumber=RE G-2012-00002&RegName=AUTO+BODY+LABOR+RATE+SURVEYS%2A[13]

With respect to repair procedures and estimates, the DOI has sued Allstate (Allstate Indemnity Company) predicated on Allstate's refusal to pay labor rates charged by repair facilities where claimants chose to repair their vehicles, by "arbitrarily capping and denying labor rates without support", "failing to prepare estimates for an amount that will allow for repairs to be made in accordance with accepted trade standards for good and workmanlike automotive repairs, failing to pay the difference between the written estimate and the higher estimate or to reasonably adjust written estimates prepared by the shop of the claimant's choice, and failing to provide support in the form of auto body repair labor rate survey or by any other data or evidence that capping and denying labor rate charged by the claimant's chosen auto body repair shop was reasonable…", "misrepresenting to claimants pertinent facts or insurance policy

---

[13] A district court may consider judicially noticed documents on a motion to dismiss. *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir.1999)." *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015). *See also Greater Baltimore Center for Pregnancy Concerns, Incorporated v. Mayor and City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013); *Brown v. City of Pittsburgh*, 586 F.3d 263, 298 n 2 (3d. Cir. 2009); *United States v. Tuente Livestock*, 888 F. Supp. 1416, 1418 (S.D. Ohio 1995); *Zephyr v. Saxon Mortg. Services, Inc.*, 873 F.Supp.2d 1223 (E.D. Cal 2012); *J.L. v. Eastern Suffolk Boces*, 113 F.Supp.3d 634 (E.D.N.Y. 2015); *Gubala v. CVS Pharmacy*, 2016 WL 1019794 (N.D. Ill. 2016).

provisions relating to any coverages at issue…", and "not attempting in good faith to effectuate

prompt, fair and equitable settlements of claims…." (SAC ¶ 35)

Third, the prevailing rates developed through the DRP programs are an inaccurate

measure.  DRP facilities are effectively subsidized by Defendant Insurers through steered repairs

and the "compensation" they receive from Defendant Insurers for minimizing loss payments.

The strict focus on volume and minimal repair cycle time (rather than quality and competency)

has resulted in flawed and failed repairs, requiring re-repair and ultimately purchase from vehicle

owners.  (SAC ¶¶ 38-51)  This occurs with respect to each of the Defendant Insurers' DRP

facilities – particularly MSOs.  (SAC ¶¶ 52-65).  Defendant Insurers' attempt to downplay the

materiality of their DRP failed repairs is misleading, as buybacks occur nationwide, and have a

"profound effect on the profitability of MSOs and other DRP facilities".  (SAC ¶ 50, 65)[14]

Defendants Insurers have been forced to purchase vehicles and pay substantial sums in damages

as a result of their DRP facilities' failed repairs, which includes the failure to adhere to

manufacturer specifications or industry guidelines impacting the structural integrity and safety of

the vehicles, including after trial.  *See, e.g.*, GEICO (SAC ¶¶ 54, 56, 62, 64)[15], Nationwide (SAC

¶ 63), State Farm (SAC ¶¶ 52-53), Progressive (SAC ¶ 55), and Allstate (SAC ¶¶ 57-61) – the

damages for which were twice acknowledged and paid by Farmers' parent company (Zurich) (in

addition to Allstate payments) given that Zurich insured Allstate's MSO-DRP facility in North

Carolina (Gerber).  In fact, that same Gerber facility is also a DRP facility for GEICO, and

continues to perform repairs that do not conform to, for example, Volkswagen certified

---

[14] That, of course, is in addition to the considerable functionality and safety issues resulting from DRP flawed and failed repairs.  (SAC ¶ 48)
[15] In one egregious example, GEICO conceded in writing to Plaintiff Crawford's that the repairs by its DRP facility were "not completely within industry standards."  (SAC ¶ 56)

manufacturer specifications regarding welding equipment, jeopardizing the structural integrity of the vehicles repaired (SAC ¶¶ 57-62).

Further, Defendant Insurers' contention that failed repairs – and buybacks concerning those vehicles – do not constitute an injury to Plaintiff misses the mark.[16]  Rather, the point is that these material costs are not factored into or accurately reflected in the determination of the so-called prevailing rates, because it is the DRP facilities (in, particular, the MSO's), that indemnify the Defendant Insurers for these costs.  (SAC ¶ 48)  Indeed, the reason that re-repairs and buybacks are necessary because of the way that DRP facilities must operate under the mandates of the Defendant Insurers (putting cycle times and volume above all else).  (SAC ¶¶ 45-47)  Accordingly, even if one were to assume, *arguendo*, that there is any validity to the so-called prevailing rates – which are predicated on Defendant Insurers' DRP repair data and manipulated claim data that Defendant Insurers run through Information Providers – the rates do not account for these substantial failure costs.  When Defendant Insurers represent that the prevailing labor rates are, for example, $X per hour rather than $Y per hour, or that certain damaged parts must be repaired rather than replaced, that certain repair procedures are unnecessary and/or that certain repair procedures should take less time – all because of what Defendant Insurers contend is prevailing in the market based on their DRP facilities' purported performance metrics, those representations wholly ignore the failed repair rates.

Defendant Insurers' policies all require that vehicles must be restored to pre-loss condition.  Further, Defendant Insurers all represent that the so-called prevailing rates define the parameters of their obligation to indemnify vehicle owners under those loss provisions of their respective policies; in other words, it defines the costs of collision repair.  It is simply a

---

[16] *See* Joint Defendants' Brf at 5.

misrepresentation for Defendant Insurers to attempt to promulgate a prevailing rate – which they use to artificially limit the indemnification obligations under their insurance policies (and those of third party insureds) – without accounting for the significant costs resulting from failed repairs.

**<u>Extortion</u>**

Lastly, in addition to viable claims for RICO fraud, Plaintiffs have pled viable RICO claims for RICO extortion.  In suppressing (and maintaining the suppression of) compensation to Plaintiffs and the proposed classes of collision repair facilities, Defendant Insurers, in violation of 18 U.S.C. § 1951, interfered with commerce by extortion through wrongful use of fear of economic loss and harm, in that Plaintiffs and the members of the Classes would not be able to perform insured repairs unless they accepted the suppressed compensation paid by Defendant Insurers, that Plaintiffs and the members of the Classes would not be free to pursue their collision repair services without interference, and/or that Defendant Insurers would respectively steer future repairs away from Plaintiffs and the members of the Classes unless they accepted the suppressed compensation paid by Defendant (SAC ¶ 268).

Defendant Insurers' argue that "hard bargaining" is not extortion.  Joint Defs Brf. at 15. The Defendant Insurers' contention parrots the finding of the Court in its prior Order, that "there is nothing wrongful about a buyer threatening to take its business elsewhere unless the seller agrees to the buyer's price."  *Id.*, quoting Order at 13.  This contention rests on a distortion of the relationship between Plaintiffs and Defendant Insurers.  It is the first and third party insurance claimants who are the Plaintiffs' customers; Defendant Insurers are merely obligated by their insurance contracts with insureds to pay for the repairs to restore the vehicles to pre-loss condition.  There is no dispute that all insurance claimants have the unfettered right to select the

repair facility of their choice, and insurance claimants have selected the Plaintiffs and the proposed classes.  Thus, this not Defendant Insurers' "business" simply to take elsewhere. Defendant Insurers will argue that insurance claimants select to take their vehicles elsewhere – after signing repair contracts with Plaintiffs (*see, e.g.*, SAC ¶¶ 289, 302-304) – based on their potential out-of-pocket costs on the repairs, but that is based on Defendant Insurers' misrepresentations of the required repairs.  It is also based on Defendant Insurers' disparaging and defamatory remarks to Plaintiffs' customers as well as Defendants Insurers' consistent steering (and attempted steering) of Plaintiffs' customers.  *See, e.g.*, SAC ¶¶ 57-60, 289, 302-304 (Nationwide advising that Audi certified K&M "overcharges", that [K&M is] "way more expensive than any other body shop", and that Nationwide "would not cover the charges"; Allstate advising the vehicle owner that K&M is "the worst body shop in Hickory; nobody gets along with them; [and that K&M] charge[s] triple what anybody else charges"); steering after repair contracts executed with Plaintiffs' customers by State Farm, GEICO and Farmers, including GEICO's claim supervisor McGurk advising that he would not pay K&M's labor rates on a Porsche repair – which requires specialized equipment and Porsche certification for access to vehicle data – because the rates were not prevailing market rates in Hickory, N.C., and *threatening to tow the vehicle 3 hours to Raleigh or 6 hours to Atlanta to another Porsche certified facility in order to enforce GEICO's purported labor rates in Hickory*, even though no other repair facility in the market was capable of performing the repairs.  (SAC ¶ 302)).

Defendant Insurers also argue that Plaintiffs' RICO extortion claims are not viable because Defendants have not obtained any "property" from the Plaintiffs.  Joint Defs Brf. at 15 But they cannot have it both ways: "[W]here the defendant has claim of right to *property* and exerts economic pressure to obtain that *property*, that conduct is not extortion and no violation of

the Hobbs Act has occurred." (Citation omitted; emphasis added.)  Defendant Insurers clearly

argue, then, that their property right consists of the Plaintiffs' repair services at the best price that

they can pay for the services.  As discussed below, Plaintiffs' repair services for insurance

claimants constitute property subject to extortion.

## II.   ARGUMENT

### A.  Rule 12(b)(6) Standard

In ruling on a motion to dismiss, the Court must view the complaint in the light most

favorable to the Plaintiff, *see, e.g., Jackson v. Okaloosa County, Fla.,* 21 F.3d 1531, 1534 (11th

Cir.1994), and must limit its consideration to the pleadings and any exhibits attached thereto.

FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.,* 999 F.2d 1508, 1510 (11th

Cir.1993). In reviewing a complaint on a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6), "courts must be mindful that the Federal Rules require only that the

complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to

relief.' " *U.S. v. Baxter Intern., Inc.,* 345 F.3d 866, 880 (11th Cir.2003) (citing Fed. R. Civ. P.

8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with

particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.,* 253

F.3d 678, 683 (11th Cir.2001). A formulaic recitation of the elements of a cause of action will

not do. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 554–555, 127 S.Ct. 1955, 167 L.Ed.2d 929

(2007). The complaint's factual allegations "must be enough to raise a right to relief above the

speculative level," *Id.* at 555, and cross "the line from conceivable to plausible." *Ashcroft v.*

*Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950–1951, 173 L.Ed.2d 868 (2009).

### B.  Plaintiffs' RICO Claims Are Sufficiently Pled

It is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering…." 18 U.S.C. § 1962(c).  To establish a federal civil RICO violation under 1962(c), plaintiff must prove (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006).  In addition, "any person injured in his business or property by reason of" RICO's substantive provisions has the right to "recover threefold the damages he sustains…." 18 U.S.C. § 1964(c).  Accordingly, Plaintiffs must show (1) the requisite injury to "business or property" and (2) that such injury was "by reason of" the substantive RICO violation.  *Mohawk Indus.*, 465 F.3d at 1283.  The "by reason of" requirement implicates two concepts: (1) a sufficiently direct injury so that a plaintiff has standing to sue and (2) proximate cause.  *Id.* at 1287 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)). Plaintiffs have satisfied their burden of pleading viable RICO claims.

### 1.  Plaintiffs Have Pled Viable RICO Enterprises

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  An association in fact enterprise reaches a group of persons associated together for the common purpose of engaging in a course of conduct, and is proved by evidence of "an ongoing organization, formal or informal", as well as evidence "that the various associates function as a continuing unit."  *U.S. v. Turkette*, 452 U.S., 576, 580, 583 (1981); *U.S. v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000) (same).  In *Boyle v. U.S.*, 129 S.Ct. 2237 (2009), the Supreme Court clarified the attributes of an association in fact enterprise.  *Boyle* held that the RICO statute defined "enterprise" broadly, such that the "enterprise" element of a

1962(c) claim can be satisfied by showing "three structural features: a purpose, relationship among those associated with the enterprise, and longevity sufficient to permit those associates to pursue the enterprise's purpose."  *Id.* at 2244-45.  Plaintiffs have pled 7 RICO association in fact enterprises, 6 bilateral enterprises consisting of Defendant Insurers and their Information Provider partner, and the State Farm enterprise, consisting of State Farm's 2 Information Provider partners, as well as its DRP facilities.[17]  Each enterprise satisfies these elements.

### a.  Bilateral Association in Fact Enterprises

"[T]he existence of an enterprise is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit…. [T]he definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however lose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation."  *Mohawk Indus.*, 465 F.3d at 1284.  There is "no basis in the language of RICO" for requiring any particular type of organizational structure.  *Boyle* 129 S.Ct. at 2245. Indeed, an association in fact enterprise need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods…. Members of the group need not have fixed roles; different members may perform different roles at different times….  While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence…."  *Id.* at 2245-46.[18]

---

[17] The Liberty Mutual enterprise also includes 2 Information Providers, AudaExplore and CCC because, for a time, Liberty Mutual affiliate Safeco used CCC, though now Liberty Mutual uses AudaExplore company-wide.

[18] To the extent that the Court relied previously on Defendant Insurers' argument that there is no "hierarchy" in the alleged enterprises (*see* Order at 11), that is not a necessary element.

A RICO enterprise "need not possess even an ascertainable structure." *U.S. v. Goldin,* 219 F.3d 1271, 1275 (11th Cir. 2000).

Further, it is unnecessary to require proof of a structure "beyond that inherent in the pattern of racketeering activity" because "the evidence used to prove a pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Turkette*, 452 U.S. at 583. Thus, "proof of a pattern of racketeering activity may be sufficient in a particular case to permit the jury to infer the existence of an association-in-fact enterprise." *Boyle,* 129 S.Ct. at 2247; *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 368 (3d Cir. 2010).

Defendant Insurers and their respective Information Provider Partner(s) have long-standing, generally exclusive, relationships, and the Information Providers' revenue is heavily dependent on Defendant Insurers. (SAC ¶¶ 67, 69-75) Each Defendant Insurer – in collaboration with their respective Information Provider partner(s) – establishes: (i) industry data for each particular Defendant Insurer on collision repairs; and (ii) industry standards for repair procedures, the scope of the procedures, and procedure times. (SAC ¶¶ 69-75, 76-80, 84, 113-139, 166-168) The data is comprised of categories of repairs and historical repair compensation for each Defendant Insurer. It is important to note that CCC, Mitchell and AudaExplore also aggregate the repair data for the collection of Defendant Insurers with which they partner. Accordingly, the industry repair data also encapsulates – and is promulgated as representative of – repair data for these larger groups of Defendant Insurers as well. The industry standards comprise what is ostensibly necessary to perform repairs. These data and standards are promulgated as the so-called prevailing rates, which are the foundation for the repairs to restore vehicles to pre-loss condition and, in turn, the compensation paid for repairs.

Further, the Information Providers have written their estimating systems so that necessary labor procedures are bundled, collapsed and combined – or eliminated, labor times and formulas are inaccurate, insufficient or limited, and many essential or frequently necessary procedures require manual entry as "Not Included" in the estimating systems' calculus of repair processes. Further, any manual entry of labor procedures or deviations in time are automatically highlighted by the estimating systems, with the use of notations such as "*", "#", "<", "< >", or where the system reports that the procedure is "INC", which means that it is already accounted for in the labor procedures and allotted time and there is no compensation for it. This occurs with respect to estimates prepared by repair professionals, insurer personnel, or when estimates are automatically converted to the Defendant Insurers' system.

Defendant Insurers, with their Information Provider Partner(s), set up estimating protocol to apply to all repair claims, which is based, in part, on the manipulated industry repair data and pre-determined parameters for repairs. Repair orders and estimates submitted by Plaintiffs and the proposed classes of collision repair facilities are then programmatically scrubbed by or though the Information Providers to enforce Defendant Insurers' protocol, and Defendant Insurers produce estimates which they present to Plaintiffs and the proposed classes which eliminate, reduce and/or modify Plaintiffs' repair processes and the labor times, and impose artificial caps on reimbursement for paint, materials and other necessary items. Using these scrubbed estimates, Defendant Insurers represent to repair professionals that manually added or expanded procedures, modified labor times or deviations are not prevailing or competitive in the market, are unnecessary to restore the insurance claimants' vehicles to pre-loss condition, and are not compensable. (SAC ¶¶ 137, 140-147) Defendant Insurers are able to make these representations based on the so-called industry repair data and standards, which purport to set the

benchmark for what are compensable repair procedures, and because the repair estimates that they present back to the Plaintiffs and the proposed classes come from the Information Provider estimating systems and have the imprimatur of the Information Providers.

Plaintiffs attached to the SAC charts (SAC Exh K and Exh M) providing some 90 representative samples of insured claims for which Defendant Insurers suppressed compensation using this methodology.  As discussed, *infra*, for illustrative purposes, Plaintiffs attach hereto as Exhibit E1-E7 the relevant excerpts of the certain claims files summarized in the charts, consisting of Defendant Insurers' estimate supplements and Plaintiffs' repair orders and invoices. These illustrative samples demonstrate Defendants Insurers' fraud in misrepresenting to Plaintiffs that repair procedures and the time spent on the procedures are not prevailing or competitive in the market, and/or are not required to perform repairs of like kind and quality, in order to return the damaged vehicles to pre-loss condition.[19]

Thus, in addition to establishing and promulgating industry repair data and repair standards, Defendant Insurers and the Information Providers defraud repair professionals like Plaintiffs and the proposed classes, the same repair professionals that purchase the estimating systems from the Information Providers for use in repairs and rely on the Information Providers' as the industry neutral guidepost for repairs.  Each of the Defendant Insurer Enterprises have joined together for the common purpose of creating a mechanism by which the Defendant Insurers could under-compensate Plaintiffs and the proposed classes of non-DRP facilities through the use of manipulated, flawed and invalid data, thereby resulting in unearned savings on Defendant Insurers' loss obligations to insurance claimants under their policies.

---

[19] The files also demonstrate the programmatic way in which the Information Provider estimating systems denote and address deviations and manually added procedures.

Further, the purpose of the Defendant Insurer Enterprises be accomplished solely by Defendant Insurers.[20]  The Information Providers provide the cover of legitimacy as the ostensible independent arbiters of industry repair data and standards – even though Defendant Insurers heavily influence that information – and are the exclusive sellers and suppliers of data and estimating programs to the repair industry.  Moreover, the scheme requires the sharing and collaboration of data and repair standards.  The Defendant Insurers and Information Providers benefit from the respective RICO Enterprises, which enable Defendant Insurers to artificially suppress compensation for collision repairs, and which also enable the Information Providers to maintain their position as the exclusive sellers and suppliers of data and estimating programs to the collision repair industry.  (SAC ¶ 188)[21]

Defendant Insurers argue that they and the Information Providers are merely pursuing their own commercial purposes in a standard customer-supplier relationship, relying on *D.M. Robinson Chiropractic v. Encompass Ins. Co. of America*, 2013 WL 1286696 (N.D. Ill. Mar. 28, 2013), and *United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013).[22]  The cases are distinguishable.  In *D.M. Robinson*, *supra*, Mitchell sold Allstate a software program to allow it to interface with a separate, *unrelated* medical claims database (Ingenix), and underpay Allstate's medical reimbursements. 2013 WL 1286696 at *2-4.  Critically, in *D.M. Robinson*, in contrast to this

---

[20] *See Insurance Brokerage*, 61 F.3d at 378 ("if defendants band together to commit [violations] they cannot accomplish alone … then they cumulatively are conducting the association in fact *enterprise's* affairs and not [simply] their *own* affairs.") (Alterations and emphasis in original).

[21] Defendant Insurers cannot challenge distinctness. Each member of the respective RICO Enterprises has an existence separate and apart from the pattern of racketeering activities of the RICO Enterprises, and each member of the respective RICO Enterprises engages in operations that are distinct from their activities on behalf of the RICO Enterprises.  Defendant Insurers all issue automotive insurance – as well as multiple lines of insurance products.  The Information Providers not only sell products to insurers and repair facilities, including, without limitation, estimating systems for vehicle damage, but numerous additional analytics programs concerning other types of claims and businesses.  With respect to the State Farm Enterprise, State Farm's DRP facilities are engaged in the business of performing collision repairs. (SAC ¶¶ 190-191)

[22] *See* State Farm Brf at 5; GEICO Brf at 6, 8.

case, Mitchell had *no direct dealings with the plaintiffs*, Mitchell provided *no industry data or standards* to either Allstate or the plaintiff providers, *Allstate did not provide any data (or input) to Mitchell* on its program, and Mitchell had *no involvement in* Allstate medical *claim reimbursement*. *Id.* at *9-11, *passim*.

   *Walgreen Co.*, is also unavailing.  Walgreen filled drug prescriptions with medications purchased from Par (a pharmaceutical manufacturer), and they were alleged to have formed a RICO enterprise.  Walgreen overcharged the plaintiff health benefits fund and other insurers by switching drug prescriptions to more expensive dosages.  *Id.* at 850-852.  Par was alleged to have facilitated Walgreen's ability to switch drugs (and thereby made more itself).  *Id.*  Plaintiff fund argued that each needed the other to fulfill the scheme, as Walgreen did not manufacture drugs and Par did not fill prescriptions.  The court rejected the theory, finding that Walgreen could simply have switched the dosages and drugs itself, or simply purchased the more expensive dosages and drugs from another manufacturer.  *Id.* at 855-56.   The court contrasted the case with *Insurance Brokerage*, where the members of the RICO enterprise were charged with fixing a purported competitive bidding processes – cooperation that fell outside the bounds of the parties' normal commercial relationship, just as Defendant Insurers and the Information Providers here are alleged to have – in tandem – falsely promulgated collision repair industry data and standards, and – further – established a method to defraud Plaintiffs (who are also the Information Providers' customers) by under-compensating for repairs.  *Id.*

   In this case, there is an "interdependence" between the members of the respective RICO Enterprises (*Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655-56 (7th Cir. 2015)), which demonstrates "involvement in the affairs" of the other.  *Kostovetsky v. Ambit Energy Holdings, LLC*, 2016 WL 105980, at *5 (N.D. Ill. Jan. 8, 2016).  Courts have routinely endorsed

such RICO enterprises.  *See Klay*, 382 F.3d at 1246-48 (insurers, software claims developers and

reviewers used computer systems to wrongfully deny and underpay providers for medical

services); *In re Managed Care Litigation*, 298 F.Supp.2d 1259, 1275, 1278 (S.D.FL. 2003)

(overarching "common purpose" among defendants to develop payment processes to underpay

health claims, fostered by sharing guidelines, software packages, and trade information); *Spencer

v. The Hartford Fin'l Svs. Grp., Inc.*, 256 F.R.D. 284, 295-98 (D. Conn. 2009 (insurers and their

brokers collectively misrepresented the underlying cost or value basis for annuities); *Mohawk

Indus.*, 465 F.3d at 1282, 1284-87 (common purpose of obtaining illegal workers for

employment to suppress wages); *Insurance Brokerage*, 618 F.3d at 377 (bid-rigging enterprise

between insurance broker and various insurers in pursuit of achieving greater business and

profits by deceiving insurance purchasers); *Coleman v. Commonwealth Land Title Ins. Co.*, 2013

WL 4675713, at *6-7 (E.D.Pa. Aug. 30, 2013), 2013 WL 4675713 at *6-*7 (bilateral enterprises

functioned to overcharge for insurance, collecting additional fees).[23]  Further, the "common

purpose of making money [is] sufficient under RICO…. members of the enterprise stand to gain

sufficient financial benefits from Mohawk's widespread employment of harboring of illegal

workers…."  *Mohawk Indus.*, 465 F.3d at 1284-85; and *Id.* at 1286-87 (it may often be that

different members of the RICO enterprise will enjoy different benefits from the commission of

the predicate acts; all that is required is that the enterprise have *a* common purpose). *See Nesbitt

v. Regas*, 2015 WL 1331291, at *7 (N.D. Ill. Mar. 20, 2015) ("common purpose of enriching

defendants"); *see also Montoya v. PNC Bank, N.A.*, 94 F.Supp.2d 1293, 1313 (S.D. Fl. 2015)

(common purpose of extracting profits from bank borrowers on forced-place insurance).  An

---

[23] GEICO's reliance on *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392 (7th Cir.2009) is misplaced.  That case
involved the sale of insurance products through a federation, where the federation played no role in the
misrepresentations concerning the sale of the products.  *Id.* at 399-400.

enterprise can even include a member's acquiescence to losing money, so long as the member is advancing the enterprise's goals. *See MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995)[24]

Defendant Insurers also argue that it is improper to include certain of their affiliates in the Defendant Insurer Enterprises.  Again, there are only 7 defendants.  Each Defendant Insurer is alleged to have company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims adjustment and administration purposes. (SAC ¶¶ 16-22, 193-194).  Further, as outlined in the SAC, the repair estimates and supplements prepared by Defendant Insurers are created using centralized, systematic programs, and bear the name of the parent or simply a generic reference to the insurer: "State Farm Insurance Companies" or "State Farm"; "Nationwide Insurance Company", "Nationwide *Enterprise*" or "Nationwide"; "GEICO"; "Progressive", and the claims personnel for each of the Defendant Insurers on all of the claims operate out of the parent company under company-wide protocol. Further, payments for repairs are frequently made by parent companies, even if affiliates are the insurer on the first-party or third-party claims for which the repairs are performed.  (SAC Exh K and Exh M, ¶¶ 193-194)

Specifically, the GEICO claims include those under GEICO General Ins. Co., GEICO Indemnity Ins. Co., GEICO Casualty Co. and GEICO General Ins. Co., but the claims estimates are all written as GEICO, by GEICO adjusters.  The Allstate claims involve Allstate Ins. Co.,

---

[24] With respect to the State Farm Enterprise, State Farm's DRP facilities are alleged to be members in the State Farm Enterprise.  The DRP facilities provide State Farm with the data to help establish its so-called prevailing rates, through mandated surveys of labor rates and paint materials reimbursement rates, and their agreement to abide by State Farm's uniform, company-wide protocol in estimating and performance metrics. (SAC ¶¶ 241-247, 255-256). Accordingly, the State Farm DRP facilities are "vital" to help the State Farm Enterprise "meet its goals".  *See MCM Partners,* 62 F.3d at 978-79; *State Farm Mut. Auto Ins. Co. v. Weiss*, 410 F.Supp.2d 1146, 1157 (M.D. Fl. 2006). Nor does there have to be collaboration among lower level enterprise members.  *Weiss v. Bank of America Corp.*, 2015 WL 9304506, at *12 (W.D. Pa. Dec. 22, 2015)

Allstate Fire & Casualty, Allstate Property & Casualty Co., and Allstate Fire & Casualty Co., but the estimates are Allstate and frequently with Allstate personnel.  Farmers' claims involve 21st Century Indemnity Ins. Co. and Mid-Century Ins. Co., but the payments are made by *Farmers*, and all claims personnel are with Farmers – and specifically, Farmers central claims services unit hpcs.com.  Liberty Mutual claims involve Liberty Mutual Ins. Co., with payment by Liberty Mutual and claims personnel estimates from Liberty Mutual, Safeco Ins. Co. with payment and claims estimates by Ohio Casualty/Liberty Mutual, and American States Ins. Co. with payment and claims estimates by Safeco.   Nationwide claims estimates are written under "Nationwide Enterprise", and paid variously by "Nationwide Insurance", or on other occasions, insured by Nationwide Affinity Ins. Co. and paid by Nationwide Ins. Co. of America and/or insured and paid by Nationwide Mutual Ins. Co.  Progressive claims are written by "Progressive" claims adjustment personnel, and variously insured and/or paid by Progressive Advanced Ins. Co., Progressive Specialty Ins. Co. and Progressive Direct Ins. Co.  State Farm claims are written by "State Farm Insurance Companies" and adjusted by "State Farm" personnel, and paid and/or insured by State Farm Mutual Automobile Ins. Co.  (SAC Exh K and Exh M, ¶¶ 193-194; Exhibits E1-E7 attached hereto)

Further, in many instances, Plaintiffs are not advised which particular affiliate has issued the policy; they are merely dealing with the corporate umbrella company.  But, Plaintiffs have provided exceedingly detailed specifics about the representative transactions it has alleged here (affiliates and actors), and Defendant Insurers can easily "sort out" which affiliates are also involved.  Under these circumstances, where certain information is uniquely within Defendant Insurers' possession, Courts have routinely applied less stringent pleading standards.  *See, e.g.*, *In re: Testosterone Replacement Therapy Prods. Liab. Litig.*, 2016 WL 427553, at *15 (N.D. Ill.

Feb. 5, 2016); *United States v. Kellogg Brown & Root Servs., Inc.,* No. 4:12-cv-4110-SLD-JAG, 2014 WL 4948136 at *10 (C.D. Ill. Sept. 30, 2014); *Jepson Inc. v. Makita Corp.*, 34 F.3d 1321, 1329 (7th Cir 1994); *Dorsey v. Rockhard Labs, LLC,* No. CV 13-07557, 2014 WL 4678969 at *5 (C.D. Cal. Sept. 19, 2014) *Hill v. Morehouse Med. Assocs., Inc.,* No. 02–14429, 2003 WL 22019936 at *3 (11th Cir. Aug. 15, 2003); *Lawrence Holdings, Inc. v. ASA Intern., Ltd.,* No. 8:14-cv-1862-T-33EAJ, 2014 WL 5502464 (M.D. Fla. Oct. 30, 2014); *U.S. ex rel. Trombetta v. EMSCO Billing Servs., Inc*., 96 C 226, 2002 WL 34543515 (N.D. Ill. Dec. 5, 2002); *Storto Enters., Inc. v. Exxonmobil Oil Corp*., CIV. WDQ-10-1630, 2011 WL 231877 (D. Md. Jan. 24, 2011)[25]

Nor is this a "shotgun" pleading, which leaves the respective Defendant Insurer groups unaware of the allegations against them.  The conduct and claims alleged in the SAC is particularized with respect to each Defendant Insurer, except, of course, where the conduct applies to *all* Defendant Insurers or issues which impact the industry as a whole.  In those instances, specific allegations relating to one Defendant Insurer are likewise applicable to the others – whose conduct has also been identified with insurer-specific allegations, because the aggregate examples depict issues concerning the whole industry; for example, failed repairs and required buybacks.  (SAC ¶¶ 46-66)  Attached hereto as Exhibit "F" is a chart identifying the specific paragraphs relating the allegations (and causes of action) against each Defendant Insurer – as well as the paragraphs that apply to all Defendant Insurers. Plaintiffs simply have not improperly "lumped" Defendant Insurers together in a "shotgun" pleading.  *See, e.g., Lockheed Martin Corp. v. Boeing Company*, 314 F.Supp.2d 1198, 1207 (M.D. Fla. 2004) (particularized allegations denoting defendants' conduct); *Hepp v. Paul Revere Life Ins. Co.*, 2014 WL 3865389

---

[25] Defendant Insurers cite *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997), which involved unrelated companies (and was decided at the summary judgment stage).

*7 (M.D. Fla. Aug. 5, 2014) (same).  Plaintiffs have therefore satisfied the pleading standards under Fed. R. Civ. P. 8(a) and 9(b).

### b.  Defendant Insurers are Conducting the RICO Enterprises

To be liable under section 1962(c), the *defendant* must "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962 (c).  Conduct "requires an element of direction," and that, "[i]n order to participate, directly or indirectly, in the conduct of such enterprises affairs, one must have some part in directing those affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (internal quotation marks removed).  The statute provides that §1962 (c) liability arises from the actions of the RICO "person(s)", not the actions of the enterprise.  *See, e.g., Cedric Kushner Promotions, LTD. v. Don King, 533 U.S. 158, 163 (2001)*; *Jay E. Hayden Found. v. First Neighbor Bank*, 619 F.3d 382, 389 (7th Cir. 2010) ("RICO offense is using an enterprise to engage in a pattern of racketeering."); *Bible*, 799 F.3d 633, 657.  Here, Defendant Insurers are the RICO persons which have conducted the respective enterprises to defraud (and extort) Plaintiffs and the proposed classes.

Notably, even if the sole purpose of the RICO enterprises alleged herein consisted of the joint efforts of the respective Defendant Insurers and their Information Provider partner(s) to compile and promulgate objective industry repair data and standards, Defendant Insurers' conduct of using those enterprises to engage in a pattern of racketeering to defraud Plaintiffs would still be actionable.  "RICO protects the public from those who would unlawfully use an enterprise (whether legitimate or illegitimate) as a vehicle through which unlawful … activity is committed."  *Young v. Wells Fargo & Co.*, 671 F.Supp.2d 1006, 1028 (S.D. Iowa 2009), quoting *Cedric Kushner Promotions*, 533 U.S. at 164-65; *see Turkette*, 452 U.S. at 591 (enterprise may

be legitimate or illegitimate).  "Congress clearly intended RICO liability to extend to situations where one entity directs the formation of a RICO enterprise and then makes use of the association to further a pattern of unlawful activity, even where portions of the unlawful activity do not issue directly from the RICO enterprise."  *Young*, 671 F.Supp.2d at 1028.

In any event, "an enterprise is operated not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."  *Id*. at 179 (internal quotation marks removed); *see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 977, 978-79 (7th Cir. 1995) ("a RICO enterprise may be operated at least by upper management, lower-rung participants in the enterprise who are under the direction of upper management, or others associated with the enterprise who exert control over it…."")  The Information Providers here have, at the very least, played "some part" in directing the operation and/or management of the RICO Enterprises to falsely establish the purported prevailing rates and repair standards, and the resulting under-compensation to Plaintiffs and proposed Classes. *See* II.(B)(1)(a), *supra*.

### 2.  Plaintiffs Have Sufficiently Alleged a Pattern of Racketeering Activity Through Predicate Acts

RICO "racketeering activity" includes specific predicate acts as defined in 18 U.S.C. § 1961(1).  In order to successfully allege a "pattern" of racketeering activity, Plaintiff must allege the commission of 2 or more predicate acts within a 10 year period that are related to each other and which amount to or pose a threat of continued criminal activity.  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240 (1989); *Jackson v. Bellsouth Telecommunications*, 372 F.3d 1250, 1264 (11th Cir. 2004).  In this case, Plaintiffs allege wire fraud (18 U.S.C. § 1343) and extortion (18 U.S.C. § 1951) as the predicate acts.

Wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme. *American Dental Assn. v. CIGNA Corp.*, 605 F.3d 1283, 1292 (11th Cir. 2010).  Each of the Defendant Insurers has committed at least two predicate acts of wire fraud as part of the scheme to defraud Plaintiff by under-compensating them for their repairs services for insurance claimants.  Extortion under the Hobbs Act "means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b).  Fear of "economic loss" indisputably qualifies. *See, e.g., Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 521 (3d Cir. 1998). Plaintiffs have sufficiently alleged both.

### a.  Plaintiffs Have Sufficiently Pled Wire Fraud

As alleged by the Plaintiffs, the transactions set forth in the SAC were representative examples, that were based on Plaintiffs' necessary restorative procedures performed for insured claimants for which Defendant Insurers' misrepresented – through estimates prepared on the Information Provider estimating systems – the necessity of the repairs, as well as the rates for those repairs, and advised Plaintiffs that the repairs and the charges were not prevailing or necessary, nor compensable as set forth in Plaintiffs' repair orders.  (SAC ¶¶ 282-307; SAC Exh K and Exh M).  Further, the Defendant Insurers used the interstate wires to, among other things, create, transmit and receive repair estimates, communications concerning the repairs and/or process payments for the repairs, as well as materials and information to establish, exchange, process and promulgate the prevailing rates, estimating profiles and company estimating protocol, including, without limitation, with the Information Providers.  (SAC ¶¶ 267, 270)

Plaintiffs' charts (together with an additional Farmers' claim (SAC Exh L) contained a total of 91 representative samples of Defendant Insurers' conduct in using the so-called prevailing rate to misrepresent and underpay the compensation due to Plaintiffs for the repairs that they performed.  Each exhibit chart summarized the insurance claim repairs performed, providing the Plaintiffs' repair order number, the Defendants Insurers' claim number, the dates on which initial estimates/repair orders and supplemental estimates/repair orders were prepared, the insuring affiliate or parent company that prepared the insurer estimates and supplements, often generically referencing the insurer without identifying an operating company, the adjuster or appraiser from the Defendant Insurers who prepared the estimates and supplements and communicated with the Plaintiffs, the dates of the estimates and supplements (and thereby the written communications), the insuring affiliate or parent company that issued payments, if known – the name of the insuring affiliate on the insurance policy, the total compensation due Plaintiffs, the amount of the payment(s) by the Defendants Insurers on the initial and supplemental estimates, and a the items reflecting the under-compensation, including the Defendant Insurers' labor rates, labor and refinishing operations, materials and parts reimbursement, and time discrepancies in operations.  *See* SAC Exh K and Exh M.

Plaintiffs provided 26 samples for State Farm, 23 samples for Nationwide, 16 samples for GEICO, 9 samples for Liberty Mutual (including Safeco), 7 samples for Allstate, 7 samples for Progressive, and 3 samples for Farmers.  In addition, there were multiple misrepresentations by each Defendant Insurer in connection with each sample claim.

Defendant Insurers' protestations as to Plaintiffs' satisfaction of Rule 9(b) ring particularly hollow in light of the manner in which, for example, State Farm, Allstate and GEICO have prosecuted RICO actions against medical providers by providing courts with an

outline of the alleged illicit conduct, and attaching charts – less detailed than Plaintiffs' –

summarizing the instances of fraud and providing discrete samples of the documentation.  In

*State Farm Mutual Automobile Insurance Company v. Warren Chiropractic & Rehab Clinic,*

2015 WL 4724829, at *8 (E.D. Mich. Aug. 10, 2015:

> [O]ver the course of a 48–page, 108–paragraph Complaint, Plaintiff details a purported
> scheme by Defendants to defraud Plaintiff. This includes allegations that Defendants:
> charged for services that were not provided; issued standard diagnoses for patients;
> ordered medical tests and treatments even when unnecessary; created a standardized
> protocol and treatment timeline for patients, regardless of individual patient need; and
> completed and used false disability certificates to obtain reimbursement for
> unnecessary transportation to Warren to ensure patients continued treating there.
> *Furthermore, Plaintiff has attached to its Complaint two spreadsheets (one regarding
> the Warren Defendants' claims and one regarding the Priority Defendants' claims),
> which detail the purportedly fraudulent mailings by Defendants. These exhibits reflect
> the claim number, dates of service, length of service, and dates of mailing, among
> other items. Plaintiff also submits various examples of purportedly fraudulent claims
> and documentation.*
>
> *Numerous courts have concluded that such documentation and explanation of the
> fraudulent scheme satisfies Rule 9(b), because it sufficiently puts the defendants on
> notice of the claims against which they will have to defend.* . . The Court is not
> persuaded by Defendants' argument that Plaintiff fails to specify which particular
> Defendant mailed which particular claim. . .  Plaintiff sufficiently alleges how the
> individual Defendants helped create, implement, and further the fraudulent billing
> scheme that foreseeably resulted in the purportedly fraudulent mailings at issue here.

*Id*. at *8 (emphasis added) (citing *State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc.,*

No. 1410266, 2014 WL 5427170, at *3 (E.D. Mich. Oct. 24, 2014) (in analyzing same argument

based on similar complaint and exhibits, finding that "[e]ach defendant has received sufficient

notice of the misrepresentations it is alleged to have made").  *See also State Farm Mut. Auto. Ins.*

*Co. v. Kugler,* 2011 WL 4389915, at *4 (S.D. Fla. Sept. 21, 2011) (chart attached to complaint

sufficient); *Allstate Ins. Co. v. Lyons,* 843 F.Supp.2d 358, 373–373 (E.D.N.Y. 2012) (rejecting

defendants' argument regarding Rule 9(b), because the plaintiff "explain[ed] in detail the

contours of the fraudulent scheme," and "[t]he [attached] charts detail the entity that submitted

each claim, as well as the corresponding claim number, the year Allstate paid the claim, and the amount paid by Allstate. Such information clearly directs defendants to the specific misrepresentations Allstate is alleging."); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs.,* 2008 WL 4146190, at *12 (E.D.N.Y. Sept.5, 2008) ("Indeed, State Farm went beyond the necessary pleading requirements for RICO in providing [similar] charts, as the allegations of a scheme to defraud and details of that scheme would have sufficed."); *Gov't Employees Ins. Co. v. Hollis Med. Care, P.C.,* 2011 WL 5507426, at *8 (E.D.N.Y. Nov.9, 2011) (collecting cases); *State Farm Mutual Automobile Insurance Company v. Pointe Physical Therapy, LLC,* 107 F.Supp. 3d 772, 789-90 (E.D. Mich. 2015) (charts "identify the Defendant involved in a particular course of treatment and submission to State Farm and reveal when the false services were rendered with respect to the identified patients. . ."); *Allstate Ins. Co. v. Linea Latina De Accidentes, Inc.,* 781 F.Supp. 2d 837, 847 (D. Minn. 2011) ("Where a plaintiff alleges a systematic practice of the submission of fraudulent claims over an extended period of time, the plaintiff need not allege the specific details of every fraudulent claim. Instead, the plaintiff must allege some representative examples of the fraudulent conduct with particularity.")

To further highlight the consistent course of conduct, attached hereto as Exhibits "E1" – "E7" are pertinent portions of certain claims files summarized in the charts that Plaintiffs attached to the SAC, consisting of Defendant Insurers' estimate supplements and Plaintiffs' repair orders and invoices.[26] These illustrative samples demonstrate Defendants Insurers' fraud in misrepresenting to Plaintiffs that repair procedures and the time spent on the procedures are not prevailing or competitive in the market, and/or are not required to perform repairs of like kind and quality, in order to return the damaged vehicles to pre-loss condition, meaning that

---

[26] Again, these documents were referenced in the SAC, provide part of the foundation for Plaintiffs' prior exhibit charts, and the authenticity of the documents is not in question. *See* n.3.

Defendant Insurers purport to have statistically valid data showing that the majority of capable collision repair facilities either do not perform these procedures at all or that they do not charge for these procedures, and/or that the Defendants Insurers' statistically valid data purportedly demonstrates that the majority of capable facilities perform these procedures in the amount of time that Defendant Insurers' have arbitrarily listed on their estimates (reducing the times listed by Plaintiffs), and/or that the times and procedures listed in the IP guides already "Include" these particular procedures, so that no additional time is warranted to perform these procedures.[27]

The following examples demonstrate the Defendant Insurers' uniform adherence to their estimating and claims adjustment protocol.  Further, the estimates and repair orders illustrate the procedures, time entries and the like that are highlighted by the IP estimating programs for scrutiny, which are then programmatically *scrubbed by the IPs* for each of the Defendant Insurers.  (SAC ¶¶ 142)

**State Farm (Exh E1)**:

Labor Rates

In connection with Crawford's ROs 5363, 5200, 5162, 5010, 4326, 4981, 4366, State Farm represented that Crawford's labor rates, including body (sheet metal), refinishing, mechanical and frame, as well and Crawford's material reimbursement rates, were not prevailing and competitive, and/or did not match the rates of those repair facilities in the market that could competently perform the repairs to restore the vehicle to pre-loss condition.  The same applies to K&M ROs 7788, 7409, 7034 and 7220.  In addition, on K&M RO 7788, State Farm conceded that several repair procedures involved operation on steel and high strength steel, which

---

[27] The following highlighted examples are not an exhaustive list of Defendant Insurers' fraud but, rather, show some of the common, uniform themes in Defendant Insurers' misrepresentations.  *See* SAC ¶¶ 286, 296, Exhs K, M. Further, the attached estimates and repair orders list the personnel from State Farm who made the representations – and/or concealed information – and the applicable dates.

accordingly were structural procedures (denoted as "s").[28]  Yet, State Farm represented that body labor rates, as opposed to much higher structural rates, were prevailing and applied to these repair procedures.  On each occasion, State Farm's limitation of the labor rates resulted in significant shortfall in compensation to Crawford's and K&M.

Adjacent weld damage repair and refinishing

These procedures are "not included" in the IP estimating databases, and the repair facility determines the procedures to be performed and the time required.  *See, e.g.,* SAC ¶¶ 131, 133, Exh. G at 36; Exh. I at 55, 157. Crawford's ROs 5363, 5162 and 5010, and K&M RO 7788 required repair and refinish operations to address weld damage to the vehicles between two and several hours. State Farm represented in its estimates for ROs 5363 and 5010 that these procedures were not necessary to perform, nor compensable.  For Crawford's RO 5162, State Farm represented that no repairs were necessary or compensable, and automatically reduced the time to refinish weld damage.  For K&M RO 7788, State Farm automatically reduced the time to repair the weld damage under representation of what was necessary and compensable to perform repairs.

Test Drive

This procedure is "not included" in the IP estimating databases (*see, e.g.,* SAC Exh. I under various "Labor Exclusions", *passim* and Exh G at 10, *passim*).  In Crawford's ROs 5363, 5200, 5162, 5010, 4981 and K&M ROs 7304 and 7220, given the damage to the vehicle and the necessary repair procedures in accordance with industry guidelines and specifications, the vehicles required a test drive.  State Farm represented that test drive is not necessary to perform, nor compensable.

---

[28] See lines 65, 73,-75 on State Farm 5/27/15 estimate.  *See, e.g.,* "Unibody Structural Components", SAC Exh H at 34.

Frame or Fixture Setup, Measure and Alignment

These procedures are "not included" or are considered a manual addition entry to labor time by the repair facility (*see, e.g.*, SAC Exh H at 4 (measure and identify), Exh I at 15, 172-73, *passim* (unibody/frame-setup and alignment).  Crawford's ROs 5363, 5162 and 5010, K&M ROs 7788 and 7304 required these procedures.  State Farm represented on Crawford's RO 5363 that these procedures were not necessary, nor compensable, on RO 5162 that these procedures would be capped by an arbitrary dollar amount that did not account for Crawford's labor time, and on RO 5010, State Farm automatically reduced the time necessary to perform these procedures, representing that Crawford's time was not prevailing or competitive, thereby reducing the compensation to Crawford's for the procedures.  On K&M RO 7788, State Farm automatically reduced the time to perform these operations, representing that K&M's time was not prevailing or competitive, thereby reducing the compensation to K&M for the procedures.  On K&M RO 7304, State Farm represented that the procedures were not necessary, nor compensable.

Clamp damage repair and refinish

These procedures are "not included" in the IP estimating databases as part of the time for labor procedures.  *See, e.g.*, SAC ¶ 129, Exh G at 10.  Crawford's ROs 5363, 5162, 5010, 4326 and 4981, and K&M RO 7304 required these procedures.  State Farm represented that it was not necessary to dress and refinish clamp marks and pinch welds, nor were those procedures compensable.

Feather, Prime and Block

The IP Guides deem this procedure to be "*required*" to restore the vehicle to the condition of new, undamaged part, but it is a manually entered judgment time by the repair

facility. *See, e.g.*, SAC ¶¶ 120, 121, 130 – 133.  Crawford's RO 5363 required this procedure.

State Farm represented that it was not necessary, nor compensable.

Specified Test Fitting for Welding

This procedures is not "included" in the IP estimating databases. *See, e.g.*, SAC Exh I at

54 (necessary alignment of parts), Exh G at 8 (same).  Crawford's ROs 5363, 5162 and 5010

required these required these procedures.  State Farm represented that it was not necessary to

perform this procedure, nor was it compensable.

Masking Operations, Covering Car and Protecting Interior

These procedures apply when refinishing the vehicle, and consist of labor and material

costs.  The IP estimating databases provide that the particular procedures performed by Plaintiffs

on the following ROs are "not included".  *See, e.g.*, SAC ¶¶ 120 – 133: *see also* Exh G at 36,

Exh H at 18.  Crawford's ROs 5363, 5200, 5162, 5010, 4326, 4981, 4702 and 4366 required

these procedures.  For ROs 4702 and 4366, State Farm represented that it was not prevailing or

necessary to perform these procedure and they were not compensable.  For ROs 5363, 5200,

5162, 5010, 4326, 4981, State Farm automatically excluded certain operations, and reduced the

labor times and material costs on others, representing that these were the prevailing rates and the

limited necessary and compensable procedures.  On K&M ROs 7304 and 7220, State Farm

represented that procedures to cover, mask and protect the vehicles were not necessary or

prevailing and were not compensable.[29]

Paint Labor and Materials (Refinishing)

On Crawford's ROs 5363, 4326 and 4366, State Farm represented that the prevailing rate

on refinishing materials (refinish and allied materials) was approximately 20-25% less.  On RO

---

[29] On RO 7304, State Farm did pay for a one-time application of a car cover to paint the vehicle.

53563 and RO 5200, State Farm represented that "color tint" is not a necessary procedure, not is it compensable. "Tinting" is standard, and is a "not included" procedure. *See, e.g.*, SAC 131, Exh G at 36. In addition, on RO 5200, State Farm represented that preparing a raw, unprimed bumper was not necessary and not compensable. Yet, IP estimating databases incorporate a formula for this procedure, and allows for additional time for other necessary, related procedures, which are "not included". *See, e.g.*, SAC 129, 133, Exh G at 10, Exh I at 157-58. Likewise, on K&M ROs 7409 and 7220, State Farm represented that the prevailing rate on refinishing materials (refinish and allied materials) was approximately 20-25% less. Further, on K&M RO 7409, State Farm represented that tinting for color match was not prevailing, necessary or compensable. *See, e.g.*, SAC ¶¶ 129, 133, Exh G at 10, Exh H at 16, Exh I at 157-58.

Corrosion Protection, Sealers, and Weld Thru Primer

These procedures and the materials involved in their application are determined in the judgment and discretion of the repair facility, and are "not included" in the IP estimating databases. *See, e.g.*, SAC ¶ 129, Exh G at 10 (weld thru primer), Exh H at 16 (anti-corrosion), and Exh I at 158 (corrosion protection). Crawford's ROs 5363, 5200, 5162, 5010, 4326, 4981 and 4702, and K&M ROs 7304 and 7220 required these procedures and materials. State Farm represented that the procedures and materials were not prevailing and therefore not necessary or compensable.[30]

Color Sand and Buff

This sanding procedure may be required – in the repair facility's judgment and discretion – to restore the entire panel of a body part to new, undamaged condition. AudaExplore, for example, contains a formula for calculating the labor time, which is 30% of refinish labor, as

---

[30] With one exception: State Farm paid an amount of $73 to reimburse K&M for $193 of seam sealer on RO 7304.

does CCC.  In contrast, "Nib Sanding/De-nib" is defined as removing isolated dirt and dust particles from, and polishing only affected areas of, the part panel.  The formula for color sand and buff does *not* apply to this procedure.  *See, e.g.*, SAC ¶ 133, Exh I at 150-51, Exh G at 37-39, Exh H at 16, 18.[31]  Further, in both color sand and biff and de-nib, "additional steps or processes that may be required should be considered during estimate preparation."  *Id.* On Crawford's ROs 5363, 5162, 5010, 4981, 4702, and 4366, State Farm automatically re-classified color sand and buff as de-nib, representing that this was the prevailing and necessary procedure, and reduced the compensation by between 50% and 75% each time.  On Crawford's RO 5200, both color sand and buff and de-nib were necessary. State Farm represented that only de-nib was prevailing and necessary and compensable.  On K&M RO 7788, State Farm automatically deducted the time by a third to perform these procedures, representing that this was prevailing and all that was necessary and compensable.  In all of the foregoing examples, State Farm applied systematic programming lacking accord with industry standards or guidelines, including, without limitation, unknown formulas and/or unsupported overlap deductions.

Clean for Delivery

These procedures to clean and detail, remove broken glass, clean and remove tar, grease and wax and the like are "not included" in IP estimating database times.  *See, e.g.*, SAC ¶ 129, Exh G at 10, Exh H at 3-4.  On K&M ROs 7409, 7304 and 7220, cleaning was necessary, but State Farm represented that it was not prevailing and necessary, and thus not compensable.  On Crawford's ROs 5363, 5200, 5162, 5010, 4326 and 4702, cleaning was necessary but State Farm automatically reduced the time on each repair by one-half to over two-third, representing that those times were prevailing and necessary and all that was compensable.

---

[31] Mitchell applies a 30% formula for color sand and buff in contrast to a 20% formula for de-nib (though this is neither regimented nor a maximum).  See SAC Exh H at 18.

Nor does State Farm abide by manufacturer guidelines.  For example, State Farm represented as not prevailing, necessary or compensable on K&M RO 7409 Audi's required seat belt check and scanning and clearing of electronic codes, on K&M RO 7304 the inspection of SRS (airbag) components and labor on wiring, trunk electronics and resetting electronic memory functions, and on K&M RO 7220, inspecting the airbag/SRS system.

State Farm's deceptive and misleading conduct is outlined, in part, in its Claim Estimatics Manual (*see* Exhibit C).

Determining Repair Costs

The prices we pay for most repair operations will be determined from printed or electronic collision estimating guides and repair facility survey results.  However, it is not possible to determine the costs of every repair operation from these sources.  For example, when estimating a sheet metal or other repair operation, the labor estimate is based on judgment time.  When estimating judgment time, it should follow what is competitive in the local market to repair the vehicle in a quality manner.

Judgement time applies when a damaged part is to be repaired through straightening, welding, adjustment, etc.  It is recognized that repairers possessing advanced skills and more sophisticated equipment may perform the repair process in less time; repairers possessing advanced skills and more sophisticated equipment may perform the repair process in less time; repairers possessing lesser skills and less sophisticated equipment may require greater time.  AEIs and, in some cases claim representatives, are expected to calculate judgment time based on what is competitive in the local market to repair the vehicle in a quality manner.

(Exh C at 320, 344)

There are no surveys, and no statistically valid bases, for State Farm to contend that there are competitive local market rates for judgment time.  State Farm's conduct to suppress compensation is instead driven systematically.

Repair Time Allowances

Flat Rate Time

1. Is published in various printed and electronic sources.
2. Is developed through the use of historical data, time studies, and input from various sources.
3. Generally applies to removal and installation of parts and refinishing.
4. Does not apply to labor involved in straightening or repairing parts.

It is State Farm's position that published flat rate times provide a generally accepted basis for the time involved in replacement and refinishing operations. While, in some cases, we may disagree with published flat rate times, it is our general policy include these times in our estimates and to accept them in estimates prepared by repairers.

(Exh C at 344)

This directs that State Farm reject any deviation in an estimating system database time by a repair professional.

Recommend Repair Procedures and Necessary Operations

Occasionally, a repairer may request a line item allowance for a specific process or activity that is associated with performing repair operations, even though it is customary in the local repair market to consider this process or activity as an included or overhead expense, and therefore, reflected within the labor rates that are charged in that area.  In these situations, claim management should explain to the selected repairer that estimates are prepared and approved in accordance with what State farm considers to be competitive practices in the established by the local repair market, and a separate line item for this process or activity will not be approved.  If it later becomes a prevailing practice in the local repair market to include a competitive line item allowance for this process or activity, a reasonable charge may be included on the estimate.  (An example of this type of request would be hazardous waste disposal.)

(Exh C at 319)

Again, there are no surveys, and no statistically valid bases, for State Farm to contend that repair facilities in the competitive local market rates simply do not charge for procedures, and this directs that personnel make such representations to repair professionals.

It is recognized that some repairers may perform … "[N]ot included" operations for no additional charge or for amounts less than the cost determined by use of the vendor's published time at a particular labor rate.  Our estimating or reimbursement practices should follow what is determined to be the most competitive.  If the estimating vendor has not published a time, work with the

selected repairer in an attempt to arrive a reasonable amount.  If a repairer requests payment for a "not included" operation that is not necessary to repair the vehicle, "*we should resist payment*."  (Emphasis added.)

(Exh C at 320)

There are no surveys, and no statistically valid bases, for State Farm to contend that repair facilities in the competitive local market rates simply do not charge for "Not Included" procedures, and this directs personnel find means to resist – or diminish – payment whenever possible.[32]

### Nationwide (EXH E2)

Labor Rates

In connection with Crawford's ROs 5292, 5283, 5158, 4866 and 4573, and K&M ROs 7362, 7329, 7209, 7166, 7139 and 7130, Nationwide represented that Plaintiffs' labor rates, including body (sheet metal), refinishing, mechanical and frame, as well as material reimbursement rates, were not prevailing and competitive, and/or did not match the rates of those repair facilities in the market that could competently perform the repairs to restore the vehicle to pre-loss condition.  In addition, on Crawford's ROs 5158 and 4866, Nationwide conceded that several repair procedures involved mechanical operations (denoted as "m")[33], but represented that body labor rates, as opposed to much higher mechanical rates, were prevailing and applied to these repair procedures.  On each occasion, Nationwide's limitation of the labor rates resulted in significant shortfall in compensation to Crawford's and K&M.

---

[32] In addition, "Estimates written or approved by State Farm are based on labor rates and repair costs not to exceed what is charged by a majority of the repair market in a given area. For this purpose, the repair market in a given area means the capacity of those repairers who meet the Equipment/Capabilities Criteria listed on the Repair Facility Survey Form. (Exh C at 320)  Plaintiffs have explained the corrupted and invalid labor rate surveys that State Farm purports to conduct.  (SAC ¶ 241-248)

[33] See, e.g., SAC Exh G at 5.

Adjacent weld damage repair and refinishing[34]

On Crawford's RO 4866, these required procedures were automatically reduced in labor time by 25% -- or denied in whole -- by Nationwide, based on the representation that the time – or the procedure -- was not prevailing or necessary, and thus not fully compensable or not compensable at all.

Test Drive

On Crawford's ROs 5292, 5183, 5158 and 4866, and K&M ROs 7209, 7171 and 7139, Nationwide represented that test drive (road test) is not prevailing or necessary, and thus not compensable.  In fact, on Crawford's RO 4866, Nationwide recognized that the test drive resulted in finding additional required repairs (*see* line 51 on Nationwide estimate), but refused to compensate for it.

Frame or Fixture Setup, Measure and Alignment

On K&M RO 7362, Nationwide represented that body rates, rather than higher frame rates, should be paid, automatically reduced the time required, and represented that unibody pull was not necessary or compensable.  On K&M ROs 7329, 7209 and 7171, Nationwide represented that body rates, rather than higher frame rates, should be paid, and automatically reduced the time required.[35]  On K&M RO 7130, Nationwide represented that body rates, rather than higher frame rates, should be paid, automatically reduced the time required, and represented that frame set up and measure was not necessary or compensable.

Clear Coat Caps/Uncompensated Clear Coat[36]

---

[34] *See supra*.  In the interest of brevity, unless necessary to provide additional information for the procedures, Plaintiffs will not re-cite to the SAC or IP Guides.

[35] On K&M RO 7139, Nationwide represented that body rates, rather than higher frame rates, should be paid.

[36] Clear coat is applied in vehicle refinishing – in addition to paint.  The IP estimating databases provide a formula for refinishing the outside panels of the vehicle, and it is a "not included" procedure in applying to the underside, edges, door jambs, etc. of the vehicle.  *See, e.g.*, SAC ¶ 103, Exh G at 36-39.  Note: This is an example where the IPs provide a so-called "cap" on clear coat to refinishing the outside panels of the vehicle which the Defendant

On Crawford's ROs 5292, 5183 and 4573, and K&M 7209, 7171, and 7166, Nationwide represented that it was prevailing to cap the clear coat application, and unnecessary (and thus not compensable) to apply clear coat to the underside, part/panel edges, door jambs, and the like on the vehicle. Further, on Crawford's ROs 5158 and 4866, and K&M RO 7171, Nationwide improperly employed the so-called "bumper prompt" to limit payment to Crawford's and K&M, by representing that the process of clear coat should be performed in one, continuous process. Nationwide indicated that "flex additive" was necessary for the vehicle bumpers, yet frequently – depending on manufacturer procedures, and as in these repairs – "flex additive" requires a separate clear coat mixture and application.  Therefore, the application to the bumper must be done separately, accounting for more time.  In these repairs, representing what was prevailing and competitive, Nationwide applied an overlap deduction to limit the labor time compensation, which had the added effect of reducing the reimbursement to the Plaintiffs for the cost of clear coat materials.

Clamp Damage Repair and Refinish

On K&M ROs 7362 and 7209, Nationwide represented that these repair and refinishing procedures were not prevailing or necessary, nor compensable.  On K&M RO 7329, Nationwide automatically reduced the labor times to represent what was purportedly prevailing and necessary, and thus compensable.

Feather, Prime and Block

On Crawford's ROs 5292, 5183 and 5158, and K&M ROs 7209 and 7130, Nationwide represented that this procedure was not prevailing or necessary, nor compensable.

Specified Test Fitting for Welding

_____

Insurers' use to their benefit because, while it would not take more than 2.5 hours to clear coat the outside panels of an entire vehicle in one application, that is not how the procedures are performed, so that it is an artificial measure.

On Crawford's ROs 5183 and 4573, and K&M RO 7171, Nationwide represented that this procedure was not prevailing or necessary, nor compensable.

<u>Masking Operations, Covering Car and Protecting Interior</u>

On Crawford's ROs 5292, 5158 and 4573, and K&M ROs 7171, 7166, 7139 and 7130, Nationwide represented that prevailing and competitive rates did not recognize these as necessary or compensable procedures, automatically reduced the time to perform the procedures, and/or recognized material costs only without labor time, all resulting in reduced compensation to Plaintiffs.

<u>Paint Labor and Materials</u>

On Crawford's ROs 5292, 5158 and 4573, Nationwide automatically capped refinish materials at $500 (where Crawford's costs were more than double that), representing that as prevailing rate.  On Crawford's ROs 5183 and 5158, Nationwide reduced or eliminated color tinting, and on Crawford RO 4573, Nationwide did not pay to refinish a bumper to match the rest of the vehicle.  ON K&M ROs 7329, 7209, 7171, 7166, 7139 and 7130, Nationwide *automatically capped paint (refinishing) materials reimbursement* despite K&M vendor invoices, then added additional line items as so-called "sublet" (to further maintain the artificial suppression of paint materials reimbursement through IP data), often without sales tax, which still significantly underpaid each invoice.  On K&M ROs 7362, 7139 and 7130, Nationwide did not pay for color tinting or prepping and priming raw bumpers.  On each of the foregoing, Nationwide represented that its estimates reflected prevailing and competitive rates and the appropriate compensation.

<u>Color Sand and Buff</u>

On Crawford's ROs 5292, 5183 and 4866, Nationwide represented that color sand and buff was not prevailing or necessary and thus not compensable.  On K&M ROs 7362, 7329, 7209, 7171, 7166, 7139 and 7139, Nationwide represented that de-nib and finesse was not prevailing or necessary and thus not compensable.

Clean for Delivery

On Crawford's ROs 5158 and 4866, Nationwide represented that cleaning the vehicle was not prevailing or necessary and thus not compensable.  On Crawford's RO 5292, Nationwide automatically cut the time for cleaning in half, and on Crawford's RO 4573, notwithstanding that Nationwide recognized that the vehicle had broken glass and tree sap inside the vehicle from the damage, Nationwide reduced the time for cleaning from 3 hours to 0.3, representing that prevailing and necessary.  On K&M ROs 7362, 7329 and 7166, Nationwide represented that cleaning the vehicle, including removal of adhesives and adhesive tape, removal of wax, tar and grease, both before and after repairs, was not prevailing or necessary, and not compensable.

Nor does Nationwide abide by manufacturer guidelines.  For example, Nationwide represented as not prevailing, necessary or compensable on Crawford's RO 5292 resetting the airbag codes, on K&M RO 7209 accessing the manufacturer's technical information and inspecting the SRS system, and K&M RO 7171 accessing the manufacturers' technical information and performing work on the SRS system in conformance with manufacturers' guidelines (Hyundai).

**GEICO (EXH E3)**:

Labor Rates

In connection with Crawford's ROs 5301, 5313, 5340, 5408 and 5368, and K&M ROs 7855, 7841, 7838 and 7248, GEICO represented that Plaintiffs' labor rates, including body (sheet metal), refinishing, mechanical and frame, as well as material reimbursement rates, were not prevailing and competitive, and/or did not match the rates of those repair facilities in the market that could competently perform the repairs to restore the vehicle to pre-loss condition, resulting in a shortfall in compensation to Plaintiffs.  In addition, on Crawford's ROs 5301, 5408 and 5368, and K&M ROs 7855, 7841, 7838 and 7248, GEICO conceded that several repair procedures involved mechanical operations (denoted as "m"), but represented that body labor rates, as opposed to much higher mechanical rates, were prevailing and applied to these repair procedures.  For certain discrete ROs (Crawford RO 5368 and K&M ROs 7855 and 7841), GEICO used line item concessions to provide Plaintiffs' with the appropriate mechanical labor rate for repairs.[37]  GEICO's use of generic or catch-all line item concessions is part of its scheme to systematically suppress labor rate through industry data reported to CCC, which reflects these procedures as body work, rather than mechanical work. Other than certain line item concession examples, GEICO paid the much lower body labor rates for the mechanical procedures.

Test Drive

On Crawford's ROs 5313, 5340 and 5368, and K&M ROs 7838 and 7248209, 7171 and 7139, GEICO that test drive (road test) is not prevailing or necessary, and thus not compensable.

Specified Test Fitting for Welding

On K&M RO 7841, GEICO represented that K&M's test fitting of panels and set up of required welders was not prevailing or necessary, nor compensable.

Masking Operations, Covering Car and Protecting Interior

---

[37] *See* Crawford's RO 5368 (GEICO estimate line 188), K&M ROs 7855 (GEICO estimate line 181) and 7841 (GEICO estimate line 147).

On Crawford's ROs 5313 and 5408, K&M ROs 7855, 7841, 7838, and 7248, GEICO represented that prevailing and competitive rates did not include procedures to mask and cover the vehicle for various repair, refinish, polishing and buffing procedures, and were not compensable.[38]

Paint Labor and Materials

GEICO's misrepresentations and omissions: Crawford's RO 5313 (two tone paint and color tint) and K&M ROs 7855 (artificial cap paint materials; prepping bumper cover), 7838 (tinting operations and arbitrary time deduction and overlap in refinishing and blending procedures), and 7248 (capped paint materials).

Corrosion Protection, Sealers and Weld Thru Primer

GEICO's misrepresentations and omissions: K&M ROs 7841 (no factory seam sealer, reduction for cavity wax/epoxy primer in time and materials, no weld thru primer)

Color Sand and Buff

GEICO's misrepresentations and omissions: On Crawford's ROs 5313 and 5368 (changed procedure to de-nib and reduced times).  On K&M ROs 7855, 7841, 7838 and 7248 (no de-nib and polish).

Clean for Delivery

GEICO's misrepresentations and omissions: On Crawford's ROs 5368 (arbitrarily reduced time).  On K&M ROs 7855, 7841, 7838 and 4248 (refused pre-wash and degrease, wash/tack after repairs, wash/tack after blocking/clean repair debris – all of which are "not included" procedures.)

---

[38] GEICO did pay once for covering the vehicle on K&M RO 7838.

Nor does GEICO adhere to manufacturer specifications.  On K&M RO 7855 (refused VW post-collision inspection per guidelines, arbitrarily reduced judgment times (without support) or neglected to include repair procedures to roof interior, aperture panel and door shell, and to recognize OEM strip factory coating).  On K&M RO 7841 (refused VW post-collision inspection per guidelines, arbitrarily reduced judgment times or refused to pay for other repair procedures).  On K&M RO 7248 (refused to recognize Airbag/SRS safety inspection).

In the interest of brevity, Plaintiff will not follow the same process for Allstate, Liberty Mutual, Progressive and Farmers, which likewise follow suit in uniform and consist misrepresentations and/or omissions to Plaintiffs regarding prevailing and necessary – and thus – compensable repairs in both the foregoing and additional categories.  The illustrative samples for those insurers are attached hereto as follows: Allstate (Exhibit E4-Crawford's ROs 4609, 4931, 5315, 5403 and 5204); Liberty Mutual (including Safeco) (Exhibit E5-Crawford's ROs 5299, 5245, 5234, 5188, 5430, 4509 and 4350); Progressive (Exhibit E6-Crawford's ROs 5232, 5172, 5370 and 5371); and Farmers (Exhibit E7-Crawford's ROs 5172, 5328 and 4971)[39]

### i.     Reliance

Plaintiffs asserting RICO claims predicated on mail fraud or, as here, wire fraud "need not show, either as an element of [their] claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."  *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 661 (2008).  Clearly, here, Plaintiffs have established that Defendant Insurers' conduct led "directly to their injuries", which satisfies the proximate cause standard.  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461.  In any event, Plaintiffs have sufficiently alleged reliance, notwithstanding Defendant Insurers' contention that Plaintiffs knew

---

[39] Respectfully, Plaintiffs stand ready to explain in detail the misrepresentations and omissions by Defendant Insurers in the discretion of, or as instructed by, the Court.

their own rates and knew that Defendant Insurers were not paying those rates.  As a threshold

matter, this speaks only labor and material rates, not repair procedures and the time to perform

those procedures.  In any event, as discussed above, all of the so-called prevailing rates are

manipulated and invalid – and are not statistically valid.  But, more importantly, the prevailing

rates are developed in a black box, and Plaintiffs have no access to this information – or the

underlying data, nor any means to assess the validity or accuracy of the information.  (SAC ¶¶

273, 334, 353, 373, 393, 413, 433, 453)  Defendant Insurers' knowing and intentional

misrepresentations, concealment and omissions of material facts concerning the prevailing rates,

including the repairs necessary to restore insured vehicles to pre-loss condition, were made for

the purpose of deceiving (and/or forcing) Plaintiffs and the proposed classes to accept less

compensation for repairs (SAC ¶¶ 267-280, 282-305)

Plaintiffs also demonstrate third party reliance, which satisfies *Bridge; see also BCS*

*Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 756-57 (7th Cir. 2011).  Plaintiffs allege that

they were injured as a direct and proximate consequence of the Defendant Insurers'

misrepresentations and omissions of material fact to first party policyholders and third party

insurance claimants, in that the Defendant Insurers "knew that first party policyholders and third

party claimants relied on [the Defendant Insurers'] misrepresentations and omissions about

prevailing rates and compensation for repairs and [the Defendant Insurers] knew that, as a result

of the misrepresentations and omissions described herein, Plaintiffs … would – and did – receive

less in compensation for collision repair services." (SAC ¶¶ 179, 337, 357, 377, 397, 417, 437,

457).

Further, Defendant Insurers' argument that reliance cannot be reasonable because there

are examples of repairs that post-date the filing of the initial complaint is unavailing. (State Farm

Brf at 3; Joint Defs Brf at 10). Plaintiffs and the Class Members *are* still being deceived and misled by the conduct of the Defendant Insurers to this day in misrepresenting prevailing rates and the basis for restorative repairs. There is no inconsistency between this fact and the fact that Plaintiffs are pleading fraud. In similar circumstances, courts have permitted plaintiffs to plead fraud claims when the alleged fraudulent conduct is ongoing after the filing of the initial complaint. *See Tilli v. Aamco Transmissions, Inc.,*Civ. A. No. 91-1058, 1992 WL 38405, at *2 (E.D. Pa. Feb. 24, 1992) (permitting amendment of complaint to state a timely claim for fraud when plaintiffs stated position that defendant's fraudulent conduct was not barred by the statute of limitations because it was ongoing).

Moreover, Defendant Insurers' theory would turn the RICO claim on its head. To prove a pattern of racketeering activity, the plaintiffs "must show at least two racketeering predicates that are related, and that they amount to or pose a threat of *continued criminal activity*." *Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1291 (11th Cir.2010) (emphasis added) (citing *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 240 (1989)). There are two types of continuity: closed-ended and open-ended. *H.J. Inc.,* 492 U.S. at 241. Closed-ended continuity is established by "proving a series of related predicates extending over a substantial period of time." *Id.* at 242. Open-ended continuity may be established by either showing that the predicate acts were a part of a "regular way of doing business" or threaten repetition in the future. *Id.* at *Jackson,* 372 F.3d at 1265.

Plaintiffs have pled open-ended continuity by alleging that Defendants continuously engaged in the RICO activity and continue to do so. Specifically, Plaintiffs allege in the SAC that the "respective RICO Enterprises are continuous, ongoing organizations associated" for common purposes. (SAC at ¶ 187). Plaintiffs further allege the continuous existence of the RICO Enterprises by setting forth the participation of and interdependence among the members; and

the ongoing and continuing continuity of membership and purpose exceeding a period of two years. (*Id.* at ¶¶ 259-261; *see also id.* at ¶¶ 333, 352, 372, 392, 412, 432, 452) (describing each respective Enterprise's pattern of racketeering activity as "continuous because it occurred over the course of a number of years" and each Enterprise's scheme to defraud and extort as "open-ended and ongoing"). Plaintiffs specifically and repeatedly allege that the RICO activity is "ongoing". (*Id.*)  Open-ended continuity does not defeat reliance.

### b.  Extortion

"Extortion" is defined as the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Plaintiffs have adequately pled each element of an extortion claim, as: (i) the Defendant Insurers "obtained" Plaintiffs' "property" by transferring their contractual obligations to repair their insureds' vehicles to Plaintiffs; (ii) the Defendant Insurers did so by the use of fear, specifically fear of economic loss, which is a recognized form of RICO fear; and (iii) the Defendant Insurers acted "wrongful[ly]" because they had no "lawful" right to obtain Plaintiffs' services by virtue of fraudulently misrepresenting the basis for their compensation, and further, fear is "wrongful" under the Hobbs Act if the plaintiff had a pre-existing statutory right – like the rights provided by the state statutes of which Plaintiffs allege violations here – to be free from the defendant's demand.

In *Scheidler*, the Supreme Court found that "property" under the Hobbs Act constituted "something of value" that defendants "could exercise, transfer, or sell." *Scheidler v. Nat'l Org. for Women, Inc.,* 537 U.S. 393, 405 (2003). In other words, "[t]he property extorted must therefore be transferable—that is, capable of passing from one person to another…" *Sekhar v. United States,* 133 S.Ct. 2720, 2725 (2013).

Plaintiffs performed repairs services for Defendant Insurers' insureds and vehicles covered by their insurance policies for which the Defendant Insurers were obligated to pay. The value of the services performed by Plaintiffs is "something of value" that Defendants "could exercise, transfer, or sell", in that it relieved Defendant Insurers of their obligations to their insureds under the policies to repair the vehicles or pay for the loss.  Contractual benefits or rights are indisputably something of value that first within the definition of property.[40]

See, e.g., DeFalco v. Bernas, 244 F.3d 286, 315 (2d Cir. 2001) (there was sufficient evidence for a reasonable jury to find that the "value of the services" of [defendant] had been extorted such that the jury could have found plaintiff was in fear of economic loss); United States v. Larson, 2013 WL 5573046, at *5 (W.D.N.Y. Oct. 9, 2013) (a "contract or contractual rights can be assigned, and therefore constitute something of value that can be exercised, transferred, or sold"); Ranieri Constr. v. Taylor, 63 F.Supp. 3d 1017, 1025-6 (E.D. Mo. 2014) (plaintiff's allegation that the property defendants sought to obtain were health benefits pursuant to a collective bargaining agreement sufficiently states "obtainable property" to support extortion claim); NRP Holdings v. City of Buffalo, No. 11-cv-472S, 2012 WL 2873899, at **11-13 (W.D.N.Y. July 12, 2002) (plaintiff had adequately stated a claim for racketeering activity by alleging defendants "impermissibly used their power to extort the value of the services of" an inexperienced developer); All World Prof. Travel Servs., Inc. v. Am. Airlines, Inc., 282 F.Supp. 2d 1161, 1175-76 (C.D. Cal. 2003) (denying motion to dismiss RICO claim when plaintiff alleged defendant "utilized threats to terminate All World's ticketing rights, solely for the purpose of obtaining All World's money, money that All World alleges American is not lawfully

---

[40] Indeed, contractual rights under the policies may even be assigned (e.g., an insured assigning loss proceeds)See, e.g., Egger v. Gulf Ins. Co., 588 Pa. 287 (2006); First Citizens Bank & Trust Co. v. Universal Underwriters Ins. Co., 440 S.E.2d 304 (N.C. Ct. App. 1994)

entitled to claim" upon finding the "right to make decisions and to solicit business free from coercion is a protectable property right" and "allegations of threats by one business entity to cause economic harm to another if the latter does not agree to a change in contract or to pay a kickback is enough to establish the predicate offense of extortion or attempted extortion"); *c.f. M.V.B. Collision, Inc. v. Allstate Ins. Co.,* 728 F.Supp. 2d 205, 217 (E.D.N.Y. 2010) (steering a car away from plaintiff's auto body shop constituted a "loss of business or other injury".)

By the conduct alleged, the Insurers then obtained that property right in violation of the Hobbs Act by depriving the Plaintiffs and Class Members of the value of the right to the fair value of the repair services. The Supreme Court's decisions in *Scheidler* and *Sekhar, supra,* do not compel a different result. As recently articulated by the Southern District of New York in *United States v. Silver*, 117 F.Supp.3d 461 (S.D.N.Y. 2015), the material distinguishing fact in both of those cases was that the property at issue could not be transferred:

> The petitioners in *Scheidler* were abortion protestors found liable for civil racketeering based on jury findings that they had "use[d] or threaten[ed] to use force, violence, or fear to cause respondents 'to give up' property rights, namely, 'a woman's right to seek medical services from a clinic, the right of the doctors, nurses or other clinic staff to perform their jobs, and the right of the clinics to provide medical services free from wrongful threats, violence, coercion and fear.' " 537 U.S. at 400–01. . .The Court held that Hobbs Act extortion, like the New York provision on which it was modeled, "retained the requirement that property must be 'obtained.' " *Id.* at 403. Accordingly, **even though intangible property rights could, consistent with *Scheidler,* be extorted, because the protesters never "obtained" the intangible rights that the clients, doctors, and clinic staff lost, the protestors did not commit Hobbs Act extortion.**
>
> The Supreme Court returned to the issue of the scope of conduct prohibited by the Hobbs Act in *Sekhar,* 570 U.S. ——, . . The defendant in *Sekhar* had threatened the General Counsel of the New York State Comptroller's Office that he would disclose embarrassing facts about the General Counsel unless he recommended that the Comptroller "approve" an investment by the New York Common Retirement Fund in the defendant's company. 570 U.S. at ——. . . If the General Counsel had made such a recommendation, and if the Comptroller had followed the recommendation and approved the investment, the Common Retirement Fund would have been permitted to invest (but would not necessarily have invested) in

the defendant's company. *Id.* Analogizing to a Pulitzer Prize Committee member's ability to recommend a recipient of that Prize, the Court acknowledged that **the right to make such a recommendation "must be valuable. But the point relevant to the present case is that *it cannot be transferred,* so it cannot be the object of extortion under the statute**." *Id.* at 2726 n. 5 (emphasis in original); *see, e.g., United States v. Carlson,* 787 F.3d 939, 944 (8th Cir. 2015) (identifying the concern in *Sekhar* as the fact that defendant "had not actually sought to deprive and/or obtain *transferable property* ") (emphasis in original); *Kerik v. Tacopina,* 64 F.Supp.3d 542, 561 (S.D.N.Y.2014) (holding, after *Sekhar,* that a perpetrator could not "extort" the victims' "intangible right to publish an article about him" because it was not a " 'transferable' item of value").

117 F.Supp. 3d at 465-6 (emphasis added) (denying motion to dismiss Hobbs Act extortion claims); *see also Smithfield Foods,* 633 F.Supp. 2d at 224 ("Contrary to the position of the Defendants, *Scheidler* did not remove extortion of intangible property rights from the reach of RICO.") Because the rights to fair repair services at issue here can be, and indeed frequently are, transferred, Defendant Insurers "obtained" Plaintiffs' property as the Supreme Court has interpreted the Hobbs Act.[41]

This Court has already recognized that the term "fear" includes the fear of economic loss. (ECF No. 201 at 12), and this has indeed been confirmed over decades of RICO jurisprudence. *See United States v. Grassi,* 783 F.2d 1572, 1578 (11th Cir. 1986) (defining "fear" as a "state of anxious concern, alarm or apprehension of harm, and it *includes* fear of economic loss as well as fear of physical violence"); *United States v. Bornscheuer,* 563 F.3d 1228, 1236-37 (11th Cir. 2009) (same); *DeFalco v. Bernas,* 244 F.3d 286, 313 (2d Cir. 2001) ("Extortion may therefore be established on a theory that activities amounted to extortion by wrongful use of fear of economic loss"); *United States v. Crockett,* 979 F.2d 1204, 1212 (7th Cir. 1992) ("It is well settled that the

---

[41] The Court declined to entertain Plaintiffs' argument in this regard in the November 2015 Order because Plaintiffs only cited a case under the federal mail and wire fraud statute, 18 U.S.C. § 1341, rather than the Hobbs Act, for the proposition that services constitute property under the Hobbs Act. Plaintiffs maintain that the Southern District of Florida's decision in *In re Managed Care Litigation,* 298 F. Supp. 2d 1259, 1279-80 (S.D. Fla. 2001) is relevant authority on this point, particularly because that court discussed *Scheidler's* holding on property rights when considering whether services constitute property under the mail and wire fraud statute.

fear required by section 1951 can be satisfied by putting the victim in fear of economic harm");

*Chevron Corp. v. Donziger*, 871 F.Supp. 2d 229, 249 (S.D.N.Y. 2012) (finding plaintiff satisfied RICO pleading standard by alleging, *inter alia,* that the RICO defendants had put "personal psychological pressure on their top executives" to force the company into making a payoff, because "as long as Chevron has alleged that the RICO Defendants "knowingly and willfully created or instilled fear of economic harm, or used or exploited existing fear of economic harm with the specific purpose of inducing Chevron to part with its property," then it adequately has alleged the wrongful use of fear.") (quoting *United States v. Abelis,* 146 F.3d 73, 83 (2d Cir. 1998)); *Southern Intermodal Logistics, Inc. v. D.J. Powers Co., Inc.,* 10 F.Supp. 2d 1337, 1352 (S.D. Ga. 1998) (finding sufficient evidence to authorize a jury finding that defendant attempted to obtain property from plaintiff and other motor carriers by inducing or exploiting the fear of economic loss (i.e., by threatening to take freight away from the carriers and prevent them from acquiring any new business).)

Plaintiffs have also pled a viable RICO claim under the predicate act of Extortion.  In suppressing (and maintaining the suppression of) compensation to Plaintiffs and the proposed classes of collision repair facilities, Defendant Insurers, in violation of 18 U.S.C. § 1951, interfered with commerce by extortion through wrongful use of fear of economic loss and harm, in that Plaintiffs and the members of the classes would not be able to perform insured repairs unless they accepted the suppressed compensation paid by Defendant Insurers (*i.e.*, the present repairs), that Plaintiffs and the members of the classes would not be free to pursue their collision repair services without interference, and/or that Defendant Insurers would respectively steer future repairs away from Plaintiffs and the classes unless they accepted the suppressed compensation paid by Defendant.  As a result, Plaintiffs and the proposed Classes were coerced

or forced to accept suppressed compensation for insured repairs predicated on fear of economic

harm, i.e., if the repair facilities wanted to do business with Defendant Insurers.  (SAC ¶¶ 268,

270, 276).

With respect to the manner in which the property was obtained, Defendant Insurers argue

that "the use of economic fear in business negotiations between private parties is not 'inherently'

wrongful," and that they merely engaged in "hard bargaining".  (ECF No. 211 at 9 (citing

*Brokerage Concepts, Inc. v. U.S. Healthcare*, 140 F.3d 494, 523 (3d Cir. 1998).)  The difference

between hard bargaining and extortion under the Hobbs Act is that a defendant's conduct will

not be actionable if he had a "lawful claim to the property."  *Id.* at 524.

> Congress included the word 'wrongful in the Hobbs Act because not every threat
> of economic harm is *wrongful*.  . . . Whether or not it is a shameful fact, it is
> nevertheless a fact that threats of economic harm are used every day as tools in the
> business world; only a few of them are extortionate.  This is the holding of *United
> States v. Enmons*, 410 U.S. 396 (1973), wherein the Supreme Court said: The term
> "wrongful," which on the fact of the statute modifies the use of each of the
> enumerated means of obtaining property- actual or threatened force, violence, or
> fear- would be superfluous if it only served to describe the means used.  For it
> would be redundant to speak of "wrongful violence" or "wrongful force" since, as
> the Government acknowledges, any violence or force to obtain property is
> "wrongful."  Rather, "wrongful" has meaning in the Act only if it limits the statute's
> coverage as to those instances where the obtaining the property would itself be
> "wrongful" because the alleged extortionist has no lawful claim to that property.

*United States v. Waters*, 850 F. Supp. 1550, 1560 (N.D. Ala. 1994) (quoting *United States v.

Emmons*, 410 U.S. 396, 398-402 (1973)).  Here, the Defendant Insurers had no "lawful" right to

obtain Plaintiffs' services by virtue of fraudulently misrepresenting the basis for their

compensation – and then obtaining their repair services at suppressed rates. *See In re Managed

Care Litig.*, 135 F.Supp. 2d 1253, 1264 (S.D. Fla. 2001) ("The distinction between extortion and

mere hard bargaining or breach of contract is not always clear. In addition, 'the line separating

lawful from unlawful claims to property obtained in business negotiations is by no means self-

evident.' *By submitting that the Defendants have in effect held an economic gun to the Plaintiffs'*

*heads and used other coercive methods to obtain property from the providers, these Plaintiffs*

*have sufficiently pled claims of extortion under the relaxed standard set forth in the federal*

*pleading rules.* Hence, the Plaintiffs will have the opportunity to prove their economic coercion

theory") (emphasis added) (citing *Brokerage Concepts,* 140 F.3d at 524)); *see also All World,*

282 F.Supp. 2d at 1174-75 (rejecting argument that plaintiff had not properly alleged extortion

when "as evidenced by the allegations in the Complaint, the parties were never engaged in hard

bargaining with respect to a prospective contract. Instead, the extortion alleged here arises out of

American's allegedly improper application of a provision in a contract between [plaintiff and a

co-conspirator] with threats of detrimental economic consequences if All World did not pay the

refund fees or penalties").

　　　　Further, economic fear is "wrongful" under the Hobbs Act if the plaintiff had a pre-

existing statutory right to be free from defendant's demand. *See George Lussier Enters., Inc. v.*

*Subaru of New England, Inc.*, 393 F.3d 36, 50 (1st Cir. 2004). Numerous states, including

Pennsylvania and North Carolina where the Plaintiff businesses are located, have "anti-steering"

laws which establish precisely these statutory rights. *See, e.g.*, 31 Pa. Code § 146.8 (b) and (d)

(standards for prompt, fair and equitable settlements applicable to automobile insurance include

requirements that insurers may not require a claimant to travel unreasonably either to inspect a

replacement automobile, to obtain a repair estimate or to have the automobile repaired at specific

repair shops; insurers' appraisals shall be in an amount for which it may be reasonably expected

the damage can be satisfactorily repaired; and the insurer may furnish to the claimant the names

of two or more conveniently located repair shops); 31 Pa. Code § 62.3(b)(3) (appraisals require a

written disclosure including a statement that there is no requirement to use any specified repair

shop); N.C. Gen. Stat. § 58-3-180(a), (b) and (b1) (policy coverage damage to a motor vehicle shall allow the claimant to select the repair service or source for the repair of the damage; the amount determined by the insurer to be payable under a policy covering damage to a motor vehicle shall be paid regardless of the repair service or source selected by the claimant; and no insurer shall recommend the use of a particular repair service without clearly informing the claimant that, *inter alia,* there is no obligation to use the recommended repair service, the claimant may use the repair service of his choice, and the insurer has a financial interest in the recommended repair service); N.C. Gen. Stat. § 58-33-76 (a) (insurance company may not recommend the use of a particular source of repair without clearly informing claimant that he is under no obligation to use the recommended service.)[42]

Plaintiffs have alleged Defendants' violations of these statutes. (SAC at ¶ 278; and see SAC ¶¶ 57-60, 289, 302-307) These statutes and others speak to the fairness, equity and impartiality that Defendant Insurers' claims adjusters are required to employ in preparing damage appraisals and repair estimates. Accordingly, Defendant Insurers' threats to steer existing repair services being performed by Plaintiffs on behalf of insureds and other vehicle owners as well as threats to steer future repairs – unless Plaintiff accepted the suppressed repair compensation, are not insulated by a "lawful claim to the property".

---

[42] *See also, generally,* 63 Pa. Code § 861(c) (requiring appraisers to secure repair estimates through personal inspection) (*note* 2015 PA H.B. 1638 (NS) (Mar. 21, 2016), proposing amendment further providing for compliance with Motor Vehicle Physical Damage Appraiser Act); 63 Pa. Code § 861(f)(2) (requiring appraisers to approach the appraisal of damaged property impartially and independently); 31 Pa. Code § 62.3(b)(5) requiring appraisal to include a description of repairs necessary to return the vehicle to its pre-damaged condition, including labor involved, cost of all parts, necessary painting or refinishing and all sublet work to be done; 31 Pa. Code § 62.3(f)(1) (requiring appraiser have no conflict of interest in the making of an appraisal); NCGSA 58-63-15(1), (4), and (11a) (defining unfair methods of competition and unfair and deceptive acts or practices in the business of insurance to include, *inter alia,* misrepresentations and false advertising of policy contracts; boycott, coercion and intimidation; and misrepresenting pertinent facts or insurance policy provisions.)

Lastly, but significantly, Defendant Insurers misconstrue the severity of 63 Pa. Code §

861(c) (requiring appraisers to secure repair estimates through personal inspection) (even though

that law is subject to pending modification).  Up to at least the present time, on every single

occasion that a repair estimate has been programmatically scrubbed and presented back to

Crawford's under the guise of the prevailing rates for repairs, Defendant Insurers violated the

law.

### 3.  RICO Injury-By Reason of Defendant Insurers' Conduct[43]

Plaintiffs hereby incorporate Section II.(B)(2)(a)(i), *supra*, for discussion of proximate

causation.

Plaintiffs and the proposed classes were the victims directly injured by Defendant

Insurers' fraudulent and extortionate conduct.  Artificial suppression of compensation for labor

rates, the cost of "paint and materials" and parts, and repair procedures is an injury suffered by

repair facilities rather than insureds and vehicle owners, who have received the full benefit of the

repairs to their vehicles.  Alternatively, Plaintiffs and the members of the Classes were injured as

a direct and proximate consequence of Defendant Insurers' conduct regarding the repairs

services performed by Plaintiffs and the members of the Classes covered by, and/or in

connection with, first party and third party insurance claims, i.e., in the context of any

representation to policyholders or third party vehicle owns about the prevailing, customary or

reasonable rates that Defendant Insurers claim is the guidepost in determining compensation for

repairs.  (SAC ¶¶ 178-179)

Plaintiffs and the members of the Classes were paid compensation by Defendant Insurers

for their repair work and services predicated on material misrepresentations and omissions

---

[43] Defendant Insurers do not challenge the fact that suppressed compensation is an injury under RICO, 18 U.S.C. § 1964(c).

concerning prevailing rates, market values and industry standards as described herein and/or

Defendant Insurers' extortionate conduct, and Plaintiffs and the members of the Classes would

not have accepted the suppressed compensation for repair work and services, i.e., being paid less

for their repair work and services, but for Defendant Insurers' conduct.  The injuries sustained by

Plaintiffs and the members of the Classes were caused by overt acts in furtherance of the

Defendant Insurers' respective conspiracies in violation of 18 U.S.C. § 1962(c), including the

misrepresentation of the prevailing rates for repairs and the artificial suppression of

compensation for repair work and services performed on vehicles covered by Defendant

Insurers, as well as Defendant Insurers' extortionate conduct.  (FAC at 180-181)  Further, *none*

of the shortfall in compensation was paid by any other source, including insureds and/or vehicle

owners.  (SAC ¶¶ 282-307)

Accordingly, there is no more "direct" or "immediate" victim of the Defendant Insurers'

RICO conduct that are more likely to vindicate the laws by pursuing a claim than the collision

repair facilities that have professionally performed the work to bring the vehicles back to the

appropriate condition, but have not been fully compensated.  *Anza*, 547 U.S. at 460.  Along the

same lines, Defendant Insurers' conduct was the direct and proximate cause of Plaintiffs' (and

the proposed Classes') injuries, and that includes the event of suppression of repair compensation

that resulted from reliance by insureds and third party vehicle owners on statements made to

them by Defendant Insurers regarding the so-called prevailing rates for repairs which limited the

compensation to be paid to repair their vehicles pursuant to the purportedly applicable terms of

insurance policies.  *Bridge*, 553 U.S. at 658-59; *BCS Services*, 637 F.3d at 756-67.

Accordingly, there is no risk of duplicative recovery, and Plaintiffs and the proposed

classes of collision repair facilities are best situated to remedy the Defendant Insurers' conduct

given that they have suffered the loss. *In re Avanadia Mktg, Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 645 (3d Cir. 2015)[44]

### 4.   **Unjust Enrichment/Fraud**

In the interest of brevity, Plaintiffs incorporate by reference their prior briefing on Unjust Enrichment and Fraud.  With respect to their claims for Unjust Enrichment, Plaintiffs additionally cite *In re Lidoderm Antitrust Litig.*, 103 F.Supp.3d 1155, 1178 (N.D. Cal. 2015) (re: North Carolina law) and Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F.Supp.2d 380, 443 (E.D.Pa. 2010) (re: Pennsylvania law) for the clear proposition that the repair services performed by Plaintiffs for insured claimants paid for by Defendant Insurers satisfies the directness standard under these states' laws.  *See also, generally, In re Managed Care Litig.*, 298 F.Supp.2d at 1298 ("satisfaction of an obligation will support of claim for unjust enrichment", citing Rest. Law of Restitution, §1, Wolf v. Nat'l Council of Young Israel, 694 N.Y.S.2d 4242, 425-26 (2d Dep't 1999)).

## III.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motions to dismiss by all Defendants in their entirety, and grant Plaintiffs such other and further relief as the Court deems just and proper, including the right to file an amended complaint to cure any deficiencies and/or to add additional information, transactions and occurrences.

Dated: April 13, 2016.

Respectfully Submitted,

*/s/ Steven L. Bloch*
Steven L. Bloch
Bailey & Glasser LLP
One Tower Bridge

---

[44] Plaintiffs incorporate by reference their argument on RICO Conspiracy under 18 U.S.C. § 1962(d) from Plaintiffs' prior briefing on Defendants' Motion to Dismiss the FAC (at Section III.(B)(6)).

100 Front Street – Suite 1235
West Conshohocken, PA 19428
Tel: (610) 834-7506
Fax: (610) 834-7509
Email: sbloch@baileyglasser.com
*Lead Counsel for Crawford's Auto
Center, Inc., K&M Collision, LLC
and the Proposed Classes*

David F. Sorensen
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
Email: dsorensen@bm.net
*Counsel for Crawford's Auto Center,
Inc., K&M Collision, LLC and the
Proposed Classes*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of April, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

_/s/ Steven L. Bloch_
Steven L. Bloch
Bailey & Glasser LLP
One Tower Bridge
100 Front Street – Suite 1235
West Conshohocken, PA 19428
Tel: (610) 834-7506
Fax: (610) 834-7509
Email: sbloch@baileyglasser.com
_Lead Counsel for Crawford's Auto Center, Inc., K&M Collision, LLC and the Proposed Classes_