# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

CRAWFORD'S AUTO CENTER, INC.
and K & M COLLISION, LLC, on behalf
of themselves and all others similarly
situated,

    **Plaintiffs,**

v.                **Case No:   6:14-cv-6016-Orl-31TBS**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, et al,

    **Defendants.**
_____

## ORDER

   This matter comes before the Court after a hearing on various motions to dismiss (Doc.

209-211) filed by the Defendants, the response in opposition (Doc. 216) filed by the Plaintiffs, the

replies (Doc. 224, 226, 228) filed by the Defendants, and the sur-reply (Doc. 235).

## I.  Background

   The instant case is one of 24 similar actions, consolidated for pretrial purposes, in which

auto repair shops in a particular state have accused insurance companies improperly attempting to

suppress the amounts they are obligated to pay for automobile repairs.   The other 23 cases

primarily asserted antitrust claims; the instant case proceeds primarily under the Racketeer

Influenced and Corrupt Organizations Act rather than the Sherman Act.

   The lead case among these actions – henceforth, the "Florida Action" – was filed in this

court in February 2014.   The initial complaint in that case was dismissed *sua sponte* in June 2014

on the grounds that it was a prohibited "shotgun" pleading, that it failed to properly set forth the

basis for the Court's jurisdiction, that it failed to identify which parties had ongoing contracts with

one another, and that all of the alleged misdeeds were attributed, collectively, to every Defendant, even where such collective attribution made no sense.   (Doc. 110 at 1-2 in Case No. 6:14-cv-310-Orl-31TBS).

The plaintiffs in the Florida Action filed an amended complaint later that same month. (Doc. 167 in Case No. 6:14-cv-310-Orl-31TBS).   Subsequently, various defendants moved to dismiss.   In January 2015, this court granted those motions in part, dismissing all the claims in the Florida Action, some with prejudice.   (Doc. 291 in Case No. 6:14-cv-310-Orl-31TBS).   The Sherman Act claims in that case – one for price-fixing, and one for an illegal boycott – were dismissed because the Florida Action Plaintiffs had failed to adequately plead the existence of an agreement and had failed to adequately allege a concerted refusal to deal, respectively.   (Doc. 291 at 20-21 in Case No. 6:14-cv-310-Orl-31TBS).   After another amended complaint and another round of motions to dismiss, the Court dismissed the Florida Action with prejudice in September 2015.   (Doc. 341 in Case No. 6:14-cv-310-Orl-31TBS).   In regard to the antitrust claims, the court again found that the plaintiffs had failed to adequately allege the existence of an agreement or a concerted refusal to deal.   (Doc. 341 at 20-21 in Case No. 6:14-cv-310-Orl-31TBS).   The plaintiffs in the Florida Action did not appeal that dismissal.[1]

The instant case was filed in the United States District Court for the Northern District of Illinois in April 2014.   (Doc. 1).   On December 61, 2014, the United States Judicial Panel on Multidistrict Litigation transferred the case to this Court.   (Doc. 61).   In February, 2015, three groups of Defendants filed motions to dismiss.   On November 25, 2015, the Court granted the

---

[1] As of the date of this order, of the 24 actions in these consolidated proceedings, the Florida Action and five others have been dismissed and not appealed or had their appeals dismissed; nine are currently on appeal; one was voluntarily dismissed; one was remanded; one was settled; and six, including this one, remain pending before this court.

motions and dismissed the First Amended Complaint (Doc. 138).   The Plaintiffs then filed their

Second Amended Complaint (Doc. 213); in response, the Defendants filed the motions that are the

subject of this order.

Except where indicated, the following is taken from the Second Amended Complaint (Doc.

205) (henceforth, the "SAC"), which is accepted as true in pertinent part for purposes of resolving

the instant motions.   The Plaintiffs in this putative class action – Crawford's Auto Center, Inc.

("Crawford's") and K&M Collision, LLC ("K&M") – operate automobile collision repair facilities

in Pennsylvania and North Carolina, respectively.   (SAC at 8-9).   The Defendants are seventy-odd

automobile insurance companies,[2] arranged into seven groups, with principal places of business

scattered across the United States.[3]   Collectively, the seven groups are referred to as the

"Defendant Insurers."

---

[2] The Plaintiffs state that most of the Defendants are "affiliates, subsidiaries, and/or divisions" of the main insurance company Defendants, but do not specify which of the other Defendants fall into which category.   So, for example, the Defendant Insurer "State Farm" consists of State Farm Mutual Automobile Insurance Company, "together with its affiliates, subsidiaries, and/or divisions" – State Farm General Insurance Company, State Farm Indemnity Company, State Farm Guaranty Insurance Company, State Farm Fire and Casualty Company, and State Farm County Mutual Insurance Company of Texas.   (Doc. 205 at 9).

[3] For brevity's sake, this opinion will identify the seven groups only briefly:   Defendant State Farm Mutual Automobile Insurance Company and five affiliate are collectively referred to as "Defendant State Farm"; Defendants Allstate Corporation and Allstate Insurance Company, along with nine affiliates, are referred to collectively as "Defendant Allstate"; and the same holds true for Defendant GEICO (Government Employees Insurance Company and seven affiliates), Defendant The Progressive (The Progressive Corporation and 24 affiliates); Defendant Farmers (Farmers Insurance Exchange, Truck Insurance Exchange and 13 affiliates); Defendant Liberty Mutual (Liberty Mutual Holding Co., Inc., Liberty Mutual Group, Inc., and eight affiliates) and Defendant Nationwide (Nationwide Mutual Insurance Company and 14 affiliates).   As to each of the seven defendant groups, the Plaintiffs in this putative class action contend that they have "company-wide, systematic and uniform claims management practices" and that the group's members "operate[] as a single, integrated enterprise for claims adjustment and administration purposes".   *See, e.g.*, SAC at 22.

According to the Plaintiffs, the Defendant Insurers have engaged in fraud and extortion to reduce the amounts they would otherwise have to pay for repairs to vehicles owned (or damaged) by their insureds.  (SAC at 116-17).   The Plaintiffs allege that the Defendant Insurers have made misrepresentations and omitted material facts as to the "prevailing rate"[4] for automobile repairs "for the purpose of deceiving Plaintiffs … to accept artificially suppressed compensation for insured repairs."  (SAC at 119).   In addition and/or in the alternative, the Plaintiffs allege that they were, among other things, "coerced or forced to accept suppressed compensation for insured repairs predicated on fear of economic harm, *i.e.*, if the repair facilities wanted to do business with Defendant Insurers."  (SAC at 121).

In carrying out their schemes, the Plaintiffs allege, the Defendant Insurers have been assisted by three "Information Providers" – CCC Information Services, Inc. ("CCC"), Mitchell International, Inc. ("Mitchell"), and AudaExplore North America, Inc. ("Audaexplore").   The Information Providers gather data regarding such things as labor rates and material costs and provide software for estimating the cost of automobile repairs.  (SAC at 13-14).   The Information Providers have not been named as defendants in this suit.

In the first seven counts of the Second Amended Complaint, the Plaintiffs assert seven claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968 – one against each Defendant Insurer.   (In addition to the direct allegations of fraud

---

[4] Although usually stated in terms of the "prevailing rate," the alleged misrepresentations and omissions at issue in this case involve not only the hourly rate for repair work, but several other aspects of a repair job that can affect the final price.   These include (1) the cost of replacement parts and materials such as paint; (2) the quality of replacement parts needed to properly perform a repair; and (3) the scope of a repair – that is, whether a particular task, such as a post-repair test drive, is required as part of a particular repair job and, if so, whether it should be separately compensated or is included in the price of the underlying repair.   Except where indicated, references in this opinion to disagreements regarding the "prevailing rate" should be understood to encompass disagreements in all of these areas.

and extortion, each of the RICO counts also includes allegations that the Defendant Insurer conspired to defraud and extort the Plaintiffs, in violation of 18 U.S.C. § 1962(c).)   In Count VIII and Count IX, the Plaintiffs assert state law claims for unjust enrichment and fraud.   The state law claims are asserted against all of the Defendants collectively.

## II.   Legal Standards

### A.   Motions to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief" so as to give the defendant fair notice of what the claim is and the grounds upon which it rests, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957), *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).   A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case.   *Milbum v. United States*, 734 F.2d 762, 765 (11th Cir.1984).   In ruling on a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff.   *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988).   The Court must also limit its consideration to the pleadings and any exhibits attached thereto.   Fed. R. Civ. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).

The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level, *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1966, and to indicate the presence of the required elements, *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1302 (11th Cir.2007).   Conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.   *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.   A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.   Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* at 1949 (internal citations and quotations omitted).   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the plaintiff is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

## B.   RICO

The Racketeer Influenced and Corrupt Organizations Act provides a civil action to recover treble damages for injury "by reason of a violation of" its substantive provisions.   18 U.S.C. § 1964(c).   It prohibits, *inter alia*, the conducting of an enterprise's affairs "through a pattern of racketeering activity."   18 U.S.C. §1962(c).   When a plaintiff's Section 1962(c) claim is based on an alleged pattern of racketeering consisting entirely of the predicate acts of mail and wire fraud, the substantive RICO allegations must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal* but also with Fed.R.Civ.P. 9(b)'s heightened pleading standard, which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010).   *See also Ambrosia Coal & Constr. Co. v. Pages Morales,* 482 F.3d 1309, 1316 (11th Cir. 2007) (holding that civil RICO claims, which are "essentially a certain breed of fraud claims, must be pled with an increased level of specificity" under Rule 9(b)).   The RICO Act also prohibits any conspiracy to violate its substantive provisions.   18 U.S.C. §1962(d).

**C.     Conflict of Laws**

In a case where federal law is at issue, a transferee court is obligated to apply the law of its

own circuit rather than that of the circuit where the case was originally filed.   *Murphy v. F.D.I.C.*,

208 F.3d 959, 965-66 (11th Cir. 2000) (citing, *inter alia, In re Korean Air Lines Disaster of*

*September 1, 1983*, 829 F.2d 1171 (D.C. Cir. 1987)).   However, *i*n cases transferred pursuant to 28

U.S.C. § 1407, the transferee court must apply the state law, including the choice of law rules, that

would have been applied had there been no change of venue.   *See, e.g. In re Managed Care*

*Litigation*, 298 F.Supp.2d 1259, 1296-97 (S.D.Fla. 2003) (citing *Van Dusen v. Barrack*, 376 U.S.

612 (1964)).

**III.     Analysis**

The Plaintiffs allege that the Defendant Insurers, who hold "almost two-thirds of the national

market share" of the private passenger automobile insurance market, "have been able to establish

the industry standards for collision repairs, including the compensation for collision repair

services."   (SAC at 18-19).   In the policies between the Defendant Insurers and their insureds, the

Plaintiffs say, the Defendant Insurers are obligated to pay the "prevailing competitive price" (or

equivalent language) for the repairs required to return the vehicles to "pre-loss condition".   (SAC at

19).   However, the Plaintiffs allege,

> Defendant Insurers (and other insurers) have tortured the meaning of
> the policy provision, and instituted a false prevailing rate that is not
> accurate, and does not represent the prevailing rate for repairs to
> properly restore vehicles to pre-loss condition. Rather, Defendant
> Insurers' fabricated prevailing rates are merely the rates imposed
> upon their respective **direct repair program** facilities

(SAC at 19-20).

According to the Plaintiffs, all of the Defendant Insurers have direct repair programs

(henceforth, "DRPs") involving auto repair facilities that agree to abide by uniform standards and

procedures.   (SAC at 22).   Though the DRP agreements differ in the particulars, generally speaking they require the insurer to recommend the DRP shop to policyholders; in exchange for the increased volume of business, the repair shop agrees to such things as caps on their labor rates and maximum prices for parts and paint.   (SAC at 23).   The DRP agreements generally also require the repair shop to use a particular piece of software – produced by one of the three Information Providers – to estimate the cost and scope of a repair to an insured's vehicle, as well as the amount of hours each aspect of a repair should take.   (SAC at 22-23).   According to the Plaintiffs, around a third of insured repairs are performed at DRP shops.   (SAC at 24).

When an insured takes a vehicle to a non-DRP facility for a covered repair, the Defendant Insurer will offer to pay the same amount as it would have paid to have the repair performed at a DRP facility, even though the non-DRP shop has not agreed to abide by the standards and procedures of that Defendant Insurer's DRP program.   (SAC at 23-24).   The Plaintiffs complain that the Defendant Insureds use the DRP rates to establish what they call "the artificial prevailing rate," and this rate is then "imposed upon the entire collision repair industry," (SAC at 205), because the insurers refuse to pay more even at non-DRP shops.

The Plaintiffs' First Amended Complaint (Doc. 138) told essentially the same story as the instant pleading.   In it, the Plaintiffs asserted extortion- and fraud-based RICO claims against the same seven Defendant Insurers and state law unjust enrichment and fraud claims against all the Defendants collectively.   In granting the Defendants' motions to dismiss that earlier pleading, the Court noted, among other things, that

- The Plaintiffs' assertions that they accepted "suppressed compensation" to perform repairs for fear that otherwise some other repair shop would otherwise get the work could not, as a matter of law, support an extortion claim.   (Doc. 201 at 11-13).

- The Plaintiffs had failed to allege that the Defendants had acquired property from them, as required to state a claim for extortion.   (Doc. 201 at 13).

-  The Plaintiffs had failed to plead fraud with particularity, describing the fraud in only the most general terms and making no effort to identify the allegedly fraudulent statements or who made them.   (Doc. 201 at 14-15).

- The Plaintiffs had failed to allege that they had suffered injury – such as being misled as to the amount they would be paid for a repair – as a result of the Defendant Insurers' alleged misrepresentations.   (Doc. 201 at 15-16).

- The state law fraud claim failed because the Plaintiffs failed to plead with the required particularity and because they had not alleged that they relied on any of the alleged misrepresentations.   (Doc. 201 at 17).

- The state law unjust enrichment claim failed because the Plaintiffs had not alleged that they had conferred a benefit on the Defendant Insurers (as opposed to their insureds).   (Doc. 201 at 18).

- Though not cited as a basis for dismissal, the Court also noted that the 157-page First Amended Complaint was "likely 100 pages longer than it ought to be."   (Doc. 201 at 9).

In response to the foregoing, the Plaintiffs filed their Second Amended Complaint.   Rather than reducing their bloated pleading, the Plaintiffs chose to add an additional 15 pages.   Even with this additional language, the Second Amended Complaint fails to remedy the vast majority of the shortcomings of the First Amended Complaint.

**A.    RICO**

To state a claim under RICO, plaintiffs must allege four elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006). Additionally, plaintiffs bringing a civil RICO action for damages must show (1) that an injury occurred to business or property and (2) that such injury was "by reason of" the substantive RICO violation. 18 U.S.C. § 1964(c); *Williams*, 465 F.3d at 1283. The "by reason of" standard requires that the defendant's misconduct directly and proximately cause the plaintiff's injury. *Id.* at 1287. When evaluating proximate cause in a RICO case, a court must ask whether the alleged violation "led directly to the plaintiff's injuries." *Id.* (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461, 126 S.Ct. 1991, 1998, 164 L.Ed.2d 720 (2006)).

The Plaintiffs' claims fail to meet almost all of these requirements.

### 1. Enterprise

For purposes of RICO, the term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). For purposes of pleading, such associations-in-fact do not necessarily have to have a hierarchy or chain of command, but they must have a "structure." *Boyle v. U.S.*, 556 U.S. 938, 945-46 (defining structure as "[t]he way in which parts are arranged or put together to form a whole" and "[t]he interrelation or arrangements of parts in a complex entity."). And a RICO enterprise must have at least three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose. *Id.* at 946.

- 10 -

As they did in the First Amended Complaint, the Plaintiffs have again failed to provide specifics as to the workings of the alleged RICO enterprises.[5]   The reader who slogs through all 172 pages of the Second Amended Complaint will be left almost entirely in the dark as to what role any of the 70-plus individual Defendants played or what actions any of them took in furtherance of the RICO enterprise – or in furtherance of anything else, for that matter.   The overwhelming majority of the substantive allegations refer to the "Defendant Insurers"; almost none identify actions taken by any individual defendant.   For example,

> In order to control and suppress costs, Defendant Insurers have, in tandem with the Information Providers, created the prevailing rate – an artificial measure of the market value for repairs.

(Doc. 205 at 42).

> Defendant Insurers have established a rigged market in which collision repair facilities must sell their repairs to insurers, which cover and pay for between approximately 75% and 90% of all automotive damage repairs annually (and Defendant insurers account for approximately two-thirds of that figure), and the collision repair facilities do not have a choice as to whether to participate in the sale of their repair services to insurers. Rather, they face a Hobson's choice: Sell into a rigged market or do not sell at all – and go out of business.

(Doc. 205 at 43-44).

> In all events, and at all material times, it is well documented that all of Defendant Insurers' hourly labor rates for collision repair services have remained depressed.

(Doc. 205 at 44).

And so on and so on.   There are almost no allegations that any individual Defendant ever took any action at all, much less that it acted in a way that defrauded or extorted property from either

---

[5]  In the order dismissing the First Amended Complaint, the Court noted that the Defendants' complaints regarding this lack of specificity were "not unfounded," but rather than analyze those complaints as a possible basis for dismissal, chose instead to focus on the failure to plead a pattern of racketeering activity.   (Doc. 201 at 11).

Plaintiff, or assisted others in doing so.   Rather than describing the actions undertaken by any individual insurer, the Plaintiffs allege only that the companies that make up each of the seven Defendant Insurers are somehow affiliated with one another and share common claims management practices.[6]  *See, e.g.*, SAC at 22.   There is no description of the role played by the individual insurers in the alleged enterprises, or the reason they played that role.   Without more, such allegations are insufficient to support the existence of an association in fact RICO enterprise.

In addition to individual Defendants, each of the seven "enterprises" is alleged to involve one or more of the Information Providers.   The Plaintiffs *have* provided some information as to the role played by the Information Providers:   They gather industry data as to labor rates, material costs, and expected time required for repairs, and they create software that is used to prepare vehicle repair estimates based on this data.   (SAC at 205).   They license their software to both insurers and repair shops – including DRP shops, which are required to use the same estimating software as the insurer(s) with which they have contracted.   (SAC at 36-37).   The Plaintiffs allege that the Defendant Insurers pressure the Information Providers into keeping estimated costs low (SAC at 37-42), although they do not assert that the Information Providers falsify the data.   The Plaintiffs also complain that the Information Providers collect repair data only from each Defendant Insurer's DRP shops, resulting in lower "prevailing rates" than would be the case if data were collected from every category of repair shop, because the DRP agreements impose price caps:

> In order to control and suppress costs, Defendant Insurers have, in tandem with the Information Providers, created the prevailing rate – an artificial measure of the market value for repairs. This so-called

---

[6]  The Plaintiffs also note that they have alleged that the estimates prepared by the Defendant Insurers bear the name of the parent company or simply a generic reference such as "Nationwide Insurance Company," and that payments for repairs are sometimes made by parent companies even if the affiliate is the actual insurer.   (Doc. 216 at 30).   Such vague allegations do nothing to describe the structure of any association in fact, however.

> prevailing rate controls all categories of compensation for repair
> rates: (i) hourly labor rates; (ii) reimbursement for "paint and
> materials"; (iii) parts pricing; and (iv) the time, scope and extent of
> compensable repair procedures – and designated labor times
> contained in the Information Provider estimating systems. Defendant
> Insurers have perpetuated this industry prevailing rate with great
> success. There is no statistical validity to the purported prevailing
> rates.   Further, the rates are comprised of flawed and rigged data,
> predicated on the agreements that Defendant Insurers have executed
> with their respective DRP network facilities. These prevailing rates
> are then forced upon non-DRP facilities (like Plaintiffs and the
> classes here), which never entered contracts to accept these rates from
> Defendant Insurers.

(SAC at 42).

The Plaintiffs in another RICO case, *Ray v. Spirit Airlines, Inc.*, 126 F.Supp.3d 1332

(S.D.Fla. 2015), made a very similar argument regarding an association in fact RICO enterprise

involving a primary defendant and a number of that defendant's vendors.   The plaintiffs there

complained that they had been defrauded into paying a "Passenger Usage Fee"; the fee had been

imposed by Spirit Airlines (henceforth, "Spirit") but had been made to appear as though it were a

government-imposed fee.   *Id*. at 1335.   The alleged enterprise consisted of the airline and, among

others, a vendor that provided airline with a sales platform that was "specifically customized for

misrepresentation and assessment of the [Passenger Usage Fee]."   *Id.* at 1341.   Noting that the

plaintiffs had not alleged that the vendor was the one who did the customization, the Court found

that what was asserted was simply a business relationship involving the purchase of the sales

platform.   The court found that the business relationship described lacked "the purpose, longevity,

or distinctiveness of a RICO enterprise."   *Id.*

Here, as in *Spirit Airlines*, the Plaintiffs have not alleged that the Defendant Insurers share a

common purpose with any of the Information Providers.   There are no allegations, for example,

that the Information Providers receive any additional compensation whenever one of the Defendant

Insurers deceives or extorts a repair shop into accepting less money for a repair.   (It should be remembered that the repair shops are also customers of the Information Providers.)   Rather, what is described is a business relationship involving the collection of repair data and the sale of estimating software.   The fact that the insurers use that data and software to justify not paying the amounts sought by the Plaintiffs does not transform that business relationship into a RICO enterprise.

Finally, with regard to Defendant State Farm, the Plaintiffs allege that the participants in the RICO enterprise include not only Information Providers but State Farm-affiliated DRP facilities, which are known as "Select Service" repair shops.   (SAC at 104-05).   However, the Plaintiffs also allege that State Farm "coerces and intimidates" the Select Service shops into keeping repair costs "as low as possible" (SAC at 106) – showing that the Select Service shops do not share a common purpose with State Farm.

Thus, as to each of the first seven counts, the Plaintiffs have failed to adequately allege the existence of a RICO enterprise.   The same holds true as to their allegations of RICO predicate acts – in this case, extortion and fraud.

## 2.    RICO Extortion

The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear, or under color of official right."   18 U.S.C. § 1951(b)(2).   Fear of economic loss can support an extortion claim under the Hobbs Act.   *United States v. Haimowitz*, 725 F.2d 1561, 1572 (11th Cir. 1984).

In this case, the Plaintiffs contend that they and the members of the putative class

> were coerced or forced to accept suppressed compensation for insured repairs predicated on fear of economic harm, i.e., if the repair facilities wanted to do business with Defendant Insurers.

(SAC at 121).   As the Court pointed out in the order dismissing the First Amended Complaint, this is not the sort of fear of economic loss that can support an extortion claim under the Hobbs Act.   To qualify as extortion, the victim must act out of fear of an *actual* loss, not the loss of a potential benefit.   *United States v. Tomblin*, 46 F.3d 1369, 1384 (5th Cir. 1995).   *See also United States v. Capo*, 817 F.2d 947 (2d Cir. 1987) (finding no extortion where alleged victims made payments to improve chances of being selected for job rather than out of fear of losing opportunity to be considered for job).

The Plaintiffs assert several other potential types of "property" that they purportedly lost as a result of the Defendants' extortion, including: the value of the repair services they performed; their right "to make business decisions free from outside pressure wrongfully imposed;" and their right "to be free from interference with their business" under, among other things, state anti-steering laws. (SAC at 121-22).   None of these alleged deprivations satisfy the requirements of the Hobbs Act, because the Defendants never obtained the thing(s) of which the Plaintiffs were allegedly deprived. *See Scheidler v. National Organization of Women, Inc.*, 537 U.S. 393, 404 (2003) (holding that Hobbs Act requires both deprivation and acquisition of property, and that interference with the rights of another, alone, is not enough).   The Plaintiffs have again failed to state a claim for extortion.   Therefore their RICO claim fails insofar as it is based on alleged extortion.

       3.   <u>RICO Fraud</u>

Racketeering conduct includes acts that are indictable under 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).   Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme.   *American Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).

Before addressing the substantive requirements of a fraud claim, the Defendants argue that – as was the case in the First Amended Complaint – the Plaintiffs have failed satisfy the particularity requirements of Rule 9(b).   Specifically, the Defendants argue that the Plaintiffs have not identified the precise misrepresentations made; the times and places where those misrepresentations were made, and the persons responsible for them; the content and manner in which these statements misled the Plaintiffs (or anyone else); and what the Defendants gained by the alleged fraud.   *See Brooks,* 116 F.3d at 1380-81.

The Defendants are correct.   As was the case with the First Amended Complaint, the Second Amended Complaint teems with vague allusions to an enormous number of alleged misrepresentations and omissions.   For example, at the outset, the Plaintiffs assert that:

> When collision repair facilities like Plaintiffs and the proposed classes present a repair order to perform the required repairs adhering to manufacturer guidelines and specifications, which also outlines the compensation for their work, they are fraudulently told – uniformly and consistently – that the additional operations or expanded procedures, as well as the labor times listed to perform these repairs, do not meet the so-called prevailing rate.

(SAC at 6).   But no such transactions are set out anywhere in the Second Amended Complaint. The closest the Plaintiffs come are two spreadsheets (one from each Plaintiff) attached to the Second Amended Complaint in which, it appears, the insurance companies offered certain sums to perform certain repair jobs and the Defendants did the repairs, even though the Defendants thought they should have gotten paid more.   (Doc. 205-12, 205-14).   Each spreadsheet identifies "discrepancies" as to the hours of labor required and "shortfalls" as to, apparently, the amount of compensation received by Crawford's or K & L for particular repair jobs.   The spreadsheets do not

- 16 -

include any of the communications that preceded the repair shop's agreeing to do the work, although a number of the entries list "Estimate" as the basis for the amount paid.[7]

The United States Court of Appeals for the Eleventh Circuit has held that pursuant to Rule 9(b), a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1380–81 (11th Cir.1997) (applying the requirements to a RICO fraud complaint).   The plaintiff must allege facts with respect to each defendant's participation in the fraud.   *Id.* at 1381.

Even generously construing them in favor of the Plaintiffs, the transactions described on these spreadsheets are insufficient.   The alleged misrepresentations are not set out in the spreadsheets.   Most importantly, there is no indication that the statements represented in those documents misled the Plaintiffs in any way.[8]

In analogous circumstances involving even more specificity as to the communications at issue, the Eleventh Circuit rejected allegations of RICO fraud, stating:

> Though the complaint sets out at least six examples of e-mail and letter communications between Defendants and Plaintiffs, including online advertisements, fee schedules, contracts, and Explanations of Benefits ("EOBs") documents … Plaintiffs do not point to a single specific misrepresentation by Defendants regarding how Plaintiffs

---

[7] The Plaintiffs attached a number of estimates as exhibits to their response to the instant motions.   (Doc. 216-5 – 216-11).   Magistrate Judge Smith struck the exhibits as evidentiary and therefore inappropriate for consideration in connection with a motion to dismiss.   (Doc. 234 at 5). The estimates have not been considered in connection with this order.

[8] In fact, the opposite appears to be true:   If anything, because the basis for a number of the payments was the estimate itself, the spreadsheets show that the Plaintiffs knew at the outset of each job that they were not being offered the price they wanted (or the price they felt they were entitled to) but they took the job anyway.

> would be compensated in any of these communications.….   If the
> specific misrepresentations do not exist, it follows that the complaint
> has not alleged a right to relief that is 'plausible on its face.'

*Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291-92 (11th Cir. 2010).

In this case, the Plaintiffs have again failed to set out the communications, much less to point to specific misrepresentations.   Accordingly, the Plaintiffs have again failed to state a fraud-based RICO claim.

As should be obvious, by failing to state RICO claims for extortion or fraud, the Plaintiffs have also failed to allege that they suffered injury to their business or property by reason of such RICO violations.[9]   Thus, they have again failed to state any valid RICO claims.   And the failure to properly assert substantive RICO claims is also fatal to the RICO conspiracy claims here.   *See Rogers v. Nacchio*, 241 Fed. Appx. 602, 609 (11th Cir. 2007) (holding that where a plaintiff fails to state a RICO claim and the conspiracy claim does not contain additional allegations, the conspiracy claim necessarily fails).

Nothing in the Plaintiffs' oral argument or their voluminous responses to the instant motions suggests that they can ever overcome the issues discussed above so as to state a valid RICO claim. Accordingly, the RICO counts will be dismissed with prejudice.

---

[9] Beyond the failure to show that any extortion or fraud took place so as to cause damage, the Plaintiffs' damages theory is flawed.   Reduced to its essence, the Plaintiffs' complaint is that the "prevailing rates" paid by the insurers are below the "market rates" for their services.   The Plaintiffs' proffered "market rate" is simply the rate the Plaintiffs would like to receive for their services – which the Plaintiffs attempt to justify by asserting the contract rights their customers have with their insurance companies.   But there is no claim here – or in the other related antitrust cases – that the Defendants have market power or the ability to control prices for auto-body repair work. Simply put, the Plaintiffs would like to receive payment for their services at a higher price than the market will bear.

C.     **State Law Claims**

In the order dismissing the First Amended Complaint, this Court noted (1) that the parties had not done much analysis as to which state's law would govern the Plaintiffs' fraud and unjust enrichment claims and (2) that it appeared that each Plaintiffs' claims should be governed by the law of the state where that Plaintiff resided.   (Doc. 201 at 17).   As a result, the Court analyzed the claims under both North Carolina and Pennsylvania law.   (Doc. 201 at 17).   The Court found that the Plaintiffs' failure to plead fraud with particularity and to plead reliance on the alleged misrepresentations was fatal to their fraud claims under both states' laws.   (Doc. 201 at 17).   And the Plaintiffs' failure to assert that they had conferred a benefit upon the Defendants was fatal to their unjust enrichment claims.   (Doc. 201 at 18).   The Defendants contend that these circumstances remain essentially unchanged the Second Amended Complaint, and the state law claims should be dismissed again, this time with prejudice.

The Plaintiffs do not mount a serious counterargument, choosing instead to "incorporate by reference their prior briefing on unjust enrichment and fraud" and to cite a handful of cases standing for the proposition that satisfaction of another person's obligation can support a claim against that person for unjust enrichment.[10]   (Doc. 216 at 67).   In citing these cases, the Plaintiffs argue that "the repair services performed by Plaintiffs for insured claimants paid for by Defendant Insurers satisfies the directness standard under these states' laws."   (SAC at 67).   However, so far as the record discloses, the Defendants are obligated to pay for repairs, not perform such repairs themselves.   Thus, when one of the Plaintiffs repairs a vehicle for one of the Defendants' insureds, the Plaintiff has not satisfied an obligation for that Defendant.   To the contrary, as the Court

---

[10] Among others, the Plaintiffs cite *In re Lidoderm Antitrust Litig.*, 103 F.Supp.3d 1155, 1178 (N.D. Cal. 2015) and *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F.Supp.2d 380, 443 (E.D. Pa. 2010).

previously noted, the performing of the repair is what *triggers* the Defendant's obligation to make payment.

Given that the allegations and arguments are otherwise unchanged, the Court concludes that the same result is required here as it was in regard to the First Amended Complaint.   As discussed above, the Court finds that the Plaintiffs (1) have again failed to plead fraud with the requisite particularity and to allege justifiable reliance upon any statement by any Defendant and (2) have again failed to allege that they conferred a benefit upon any Defendant.   These failures are fatal to their fraud and unjust enrichment claims, respectively, under both North Carolina and Pennsylvania law.   This is the Plaintiffs' second opportunity to plead these claims, and they show no sign of being able to overcome these flaw.   Accordingly, the state law claims will also be dismissed with prejudice.

## IV.     Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the motions to dismiss (Doc. 209-211) are **GRANTED** and the Second Amended Complaint is **DISMISSED WITH PREJUDICE**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 8, 2017.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party